# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM F. DAVIS, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-67-SLR |
| | ) | |
| WARDEN RAPHAEL WILLIAMS, | ) | Jury Trial Requested |
| C/O DAVIES, CAPTAIN EMMIT | ) | |
| C/O REGINALD MAYES, DEBRA | ) | |
| MUSCARELLA, NURSE JEREMY, | ) | |
| and OFFICER FRED WAY, | ) | |
| | ) | |
| Defendants. | ) | |

## STATE DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

*/s/ Erika Y. Tross*
Erika Y. Tross (#4506)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400
    Attorney for State Defendants

Dated: October 15, 2007

## <u>TABLE OF CONTENTS</u>

Table of Citations ……………………………………………………............     iii

Nature and Stage of the Proceedings …………………………………………     1

Summary of the Argument ………………………………………………………     4

Statement of the Facts ……………………………………………………...     6

Argument …………………………………………………………………..     13

I.     State Defendants Are Immune From Liability In Their Official
       Capacities Pursuant To The Eleventh Amendment …………………..     14

II.    Davis Did Not Exhaust The Administrative Remedies Available To
       Him.  Therefore His Claims Should Be Dismissed Under The PLRA .     16

III.   Warden Williams Cannot Be Held Liable For Davis's Claims Based
       Solely On The Theory Of Respondeat Superior ……………………...     20

IV.    Warden Williams Cannot Be Held Liable Where He Had No Personal
       Involvement In The Alleged Deprivation Of Davis's Rights ………...     21

V.     Davis's Bald And Unsubstantiated Allegations Are Not Supported By
       The Record.  Therefore No Fair Minded Jury Could Return A Verdict
       For Davis On The Failure To Protect, Deliberate Indifference Or
       Failure To Investigate Claims …………………………………………...     23

       A.     The State Defendants did not violate Davis's constitutional
              right to protection …………………………………………….     24

              1.  First Basketball Incident …………………………………     25

              2.  Second Basketball Incident ………………………………     27

              3.  May 31 Breakfast Fight …………………………………...     30

       B.     The State Defendants provided Davis access to medical
              attention and treatment and were not deliberately indifferent
              to his medical needs …………………………………………..     31

       C.     The State Defendants investigated the events alleged in
              Davis's Complaints.  Moreover any failure to investigate does
              not constitute a violation of Davis's constitutional rights …….     32

i

VI.     State Defendants Are Immune From Liability In Their Individual Capacities Pursuant To The Doctrine Of Qualified Immunity ………..     33

     A.     The facts alleged shows that the State Defendants' conduct did not violate Davis's constitutional rights …………………     34

     B.     Davis's rights were not clearly established such that the State Defendants understood that their conduct violated his rights ...     35

Conclusion ……………………………………………………………………     37

## <u>TABLE OF CITATIONS</u>

**<u>Cases</u>**

*Anderson v. Creighton,*
  483 U.S. 635, 640 (1987) …………………………………………...    33-34

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 248 (1986) …………………………………………...    13, 23

*Brookins v. Williams,*
  402 F.Supp.2d 508, 512 (D. Del. 2005) ……………………………….    22

*Carter v. Exxon Company USA,*
  177 F.3d 197, 202 (3d Cir. 1999) …………………………………...    13

*Celetox Corp. v. Catrett,*
  477 U.S. 317, 322-23 (1986) ………………………………………….    23

*Durmer v. O'Carroll,*
  91 F.2d 64, 67 (3d Cir. 1993) ……………………………………….    31

*Edelman v. Jordan*
  415 U.S. 651, 662-63 (1974) ……………………………………….    14-15

*Farmer v. Brennan,*
  511 U.S. 825, 833 (1994) …………………………………………...    24

*Gay v. Petsock*
  917 F.2d 768, 771 (3d Cir. 1990) …………………………………...    22

*Grant v. City of Pittsburgh*
  98 F.3d 116, 121 (3d Cir. 1996) ……………………………………….    35

*Hafer v. Melo,*
  502 U.S. 21 (1991) ………………………………………………….    15

*Hamilton v. Leavy,*
  117 F.3d 742, 746 (3d Cir. 1997) …………………………………...    24-25

*Harlow v. Fitzgerald,*
  457 U.S. 800, 818 (1982) …………………………………………...    33

*Pennsylvania v. Porter,*
  659 F.2d 306, 336 (3d Cir. 1981) …………………………………...    21-22

*Porter v. Nussle*
     534 U.S. 516, 524 (2002) ……………………………………………... 16-17

*Rode v. Dellarciprete,*
     845 F.2d 1195, 1207 (3d Cir. 1988) ……………………………………... 20-22

*Rouse v. Plantier,*
     182 F.3d 192, 197 (3d Cir. 1999) ……………………………………... 31

*Saucier v. Katz*
     533 U.S. 194, 200 (2001) ……………………………………………... 34

*Sample v. Diecks*
     885 F.2d 1099, 1116-17 (3d Cir. 1989) …………………………………. 20

*Seminole Tribe of Florida v. Florida,*
     517 U.S. 44 (1996) ……………………………………………………. 15

*Scott v. Harris,*
     -- U.S. --, 127 S.Ct. 1769 (2007) ……………………………………… 23, 34

*Vick v. Haller,*
     512 A.2d 249 (1986) …………………………………………………... 33-34

*Will v. Michigan Dept. of State Police,*
     491 U.S. 58, 71 (1989) ……………………………………………….... 15

*Woodford v. Ngo*
     126 S.Ct. 2378, 2387 (2006) …………………………………………….. 17

**<u>Statutes, Rules and Other Authority</u>**
42 *U.S.C.* § 1983 …………………………………………………………… *passim*

42 *U.S.C.* § 1997e(a) …………………………………………………….. 16

Federal Rule of Civil Procedure 56(c) …………………………………….... 14

U.S. Constitution, Eleventh Amendment …………………………………..... 14

## NATURE AND STAGE OF THE PROCEEDINGS

On February 9, 2005, Plaintiff William F. Davis, III ("Davis" or "Plaintiff"), an inmate currently incarcerated at the Delaware Correctional Center, filed a lawsuit pursuant to 42 *U.S.C.* § 1983 against defendants State of Delaware Department of Correction, Warden Raphael Williams ("Warden Williams"), Stanley Taylor, First Correctional Medical ("FCM") and Mental Health (the "Original Complaint") (D.I. 2). At the time of the events alleged in the Original Complaint Davis was incarcerated at the Howard R. Young Correctional Institution ("HRYCI"). By the Original Complaint Davis claims that the State Defendants violated his constitutional rights by, *inter alia*, failing to protect him from another inmate and being deliberately indifferent to his medical needs.

The same day he filed the Complaint, Davis filed a Motion to Proceed In Forma Pauperis. (D.I. 1). By order dated March 7, 2005, this Court granted Davis leave to proceed *in forma pauperis*. (D.I. 3).

Approximately seven months after filing the Original Complaint, Davis filed an amended complaint (the "First Amended Complaint") dismissing as defendants the State of Delaware Department of Correction, Stan Taylor, and Mental Health. (D.I. 8). In addition to dismissing these defendants, Davis added several new defendants including Correctional Officer Kerry Davies ("Officer Davies"), Deputy Warden Mark Emig ("Deputy Warden Emig"), and Correctional Officer Reginald Mays ("Officer Mays", and together with Warden Williams, Officer Davies and Deputy Warden Emig,

the "State Defendants").[1]  Although the First Amended Complaint added new defendants it made no changes to the allegations in the Original Complaint nor did it contain any new allegations.

On September 8, 2006, State Defendants filed a timely answer to Plaintiff's Original and First Amended Complaints denying the allegations in the Complaints and asserting various defenses and affirmative defenses.  (D.I. 24).  Three days later defendants FCM and Deborah Muscarella filed a motion to dismiss.  (D.I. 25). Over two months after the defendants filed responses, Davis filed a second motion to amend seeking to add two more defendants – Officer Fred Way and Nurse Jeremy (the "Second Amended Complaint" and together with the Original Complaint and First Amended Complaint, the "Complaints").  (D.I. 26, filed November 20, 2006).

In a Memorandum Opinion and Order dated July 19, 2007, the Court granted in part FCM and Deborah Muscharella's motion to dismiss, dismissing Davis's medical negligence claim and all claims against FCM.  (D.I. 48, 49).  Thus the Court terminated FCM as a party to the litigation.  By its Order the Court also granted Davis's motion to amend and added Nurse Jeremy and Officer Fred Way as defendants.  It appears from the docket, however, that to date, Officer Fred Way has never been served with the Complaints.  Therefore, Officer Way is not a party to the State Defendants' Motion for Summary Judgment.

In accordance with the Court's Scheduling Order dated June 15, 2007, discovery ended on August 13, 2007.  (D.I. 40).  Thus this matter is ripe for summary

---

[1] The First Amended Complaint incorrectly lists the names of State Defendants Deputy Warden Mark Emig (listed as Captain Emmit) and C/O Reginald Mays (listed as C/O Reginald Mayes).

2

judgment.  On October 15, 2007, State Defendants filed their Motion for Summary Judgment (the "Motion for Summary Judgment").  This is State Defendants Warden Raphael Williams, C/O Kerry Davies, Deputy Warden Mark Emig, and C/O Reginald Mays' Opening Brief in Support of the Motion for Summary Judgment (the "Opening Brief").

**SUMMARY OF THE ARGUMENT**

I.       The State Defendants are not considered "persons" for purposes of 42 U.S.C. § 1983. As a result, the Eleventh Amendment, in conjunction with the State of Delaware's sovereign immunity, protect the State Defendants from liability for Davis's claims. Therefore this Court lacks jurisdiction over the State Defendants in their official capacities and Davis cannot maintain his claims against State Defendants in their official capacities.

II.      The events in Davis's lawsuit occurred while he was incarcerated at HRYCI. As an incarcerated individual challenging conditions of confinement, Davis was required to exhaust HRYCI's administrative remedies prior to filing his lawsuit in accordance with the Prison Litigation Reform Act. In this case Davis filed a grievance but was satisfied with the results of the grievance and did not pursue all the steps of HRYCI's grievance procedure. Therefore Davis did not exhaust his available administrative remedies and he is prevented from pursuing his claims in accordance with the PLRA.

III.     Davis's claims against Warden Williams are based solely on his supervisory responsibilities and his position as Warden. Because Davis cannot maintain an action under 42 U.S.C. § 1983 against Warden Williams solely on the theory of respondeat superior and because Warden Williams was not deliberately indifferent to Davis's plight, the claims against Warden Williams should be dismissed.

4

IV.     A Plaintiff filing a lawsuit pursuant to 42 U.S.C. § 1983 is required to show that the defendant had personal involvement in the alleged wrongs.  In this case, the record is clear that Warden Williams had no personal involvement in the incidents alleged in Davis's Complaints.  Therefore, Davis cannot maintain an action against Warden Williams and summary judgment is appropriate.

V.      The record reveals that there are no genuine issues of material facts as to the allegations in Davis's Complaints.  Because the record proves that the State Defendants did not violate Davis's constitutional rights, no fair minded jury could find in favor of Davis on any of his claims and the State Defendants are entitled to summary judgment as a matter of law.

VI.     The State Defendants properly performed their duties without violating Davis's clearly established constitutional rights.  Therefore the State Defendants are protected from liability for Davis's claims by the doctrine of qualified immunity.

## STATEMENT OF THE FACTS

The allegations in Davis's Complaints all stem from his interaction with one inmate – Brian Casey.  At HRYCI, Davis and Casey were incarcerated for a short period of time on the same tier – 1D, the mental health tier.  (Exhibit A – Davis Deposition 25:10-15).  At some point during the incarceration Casey began calling Davis names.  Specifically Casey called Davis a child molester.  (Davis Depo. 11:13-12:1).  Davis is serving a sentence on charges stemming from a burglary.  (Davis Depo. 12:2).  Despite knowing that the allegations were not true, Davis believed that being called a child molester put him at risk.  (Davis Dep. 9:17-19).  Although he believed he was at risk, Davis did not file a grievance regarding Casey calling him a child molester.  Davis contends that he told an officer named Reynolds that Casey was calling him a child molester.  (Davis Dep. 11:22-23).

### First Basketball Incident

Davis's recollection of the events surrounding the first physical encounter with Casey differ.  In the first section of the Statement of Claim in the Original Complaint, Davis states that the encounter occurred on May 31, 2002.  The second section of the Original Complaint does not mention the incident.  Further, the Second Amended Complaint does not mention the incident.  For the first time, in his deposition, Davis states that the incident occurred on May 16, 2004.  (Davis Dep. 38:5-39:11).

Davis asserts that on May 16, 2004 he was playing basketball with about fifteen (15) other inmates during recreation time in the yard at HRYCI.  (Davis Dep. 14:20-15:3).  The officer supervising the inmates was Officer Mays.  (Davis Dep. 15:4-10).  Davis contends that the game was competitive and he admits that he was being an

aggressive player.  (Davis Dep. 15:21-22).  He further states that he was "doing what [he]

wanted] to do because of [his] size."  (Davis Dep. 16:2-3).  Davis asserts that while

playing basketball, Casey did not like Davis's aggressive playing and "mushed" him in

the face (the "First Basketball Incident").

> Q (DAG):      Tell me about the first incident.  How many
> inmates were out in the yard while you were playing
> basketball?
> A (Davis):      Roughly, 15.
> Q:      How many officers were out there?
> A:      One.
> Q:      Who was the officer?
> A:      One occasion was Officer Mayes, and the second
> one – occasion was Officer Davies.
> Q:      So on the first occasion it was Officer Mayes?
> A:      Yes.
> Q:      Okay.  Were you playing basketball?
> A:      Yes.
> Q:      Was Mr. Casey playing basketball?
> A:      Yes.
> Q:      So how did it happen that he pushed you in the
> face?
> A:      That he – he mushed me.  Well, pushed, mushed.
> Right.  Because basketball is a competitive sport – and a lot
> of people – if somebody is dominating the game and other
> people instigating things, the other party don't like it.  And
> me being an aggressive player and having fun – I like
> having fun.  And some people don't like it.  And they do all
> their power to try to stop you from scoring.
>          And in that situation, you know, I'm having fun,
> laughing, you know, doing what I want to do because of
> my size. ….

(Davis Dep. 14:24-16:3).  Davis further admits that the "mush" or push was "just a

mush" and was "not that serious."  (Davis Dep. 17:18-19).

Following the "mush", Davis did not file a sick call slip alleging that he

had suffered an injury.  In addition Davis did not file a grievance regarding the incident

until two months later.  (Exhibit I; Davis Dep. 23:13-17).

<u>Second Basketball Incident</u>

Despite the "mush" by Casey during the First Basketball Incident, a few days later, Davis again participated in a basketball game with Casey during recreation time. (Davis Dep. 18:11-14). This time Davis asserts approximately ten inmates were playing basketball and Officer Davies was supervising. (Davis Dep. 18:23-24, 19:2-5). The game was competitive, Davis was aggressive, and Casey "mushed" Davis again (the "Second Basketball Incident").

> Q (DAG):      Okay. Now the second incident was also on the basketball court?
> A (Davis):      Yes.
> Q:      Tell me how many inmates do you remember out then.
> A:      Probably the same. You know, I don't know. It's not my job to count them. That wouldn't even make sense.
> Q:      But you weren't the only inmate out there?
> A:      No.
> Q:      Okay. Was it more than five?
> A:      Yeah. There was more than five.
> Q:      More than ten?
> A:      Yeah. I mean, just ten. Like I say, it's not crowded. There's not a lot of people out there.
> Q:      How many officers were out there?
> A:      One.
> Q:      Who was that officer?
> A:      Davies.
> Q:      What happened in this instance?
> A:      Same thing.
> Q:      So you were playing basketball?
> A:      Yep. And he did it again.
> Q:      And Casey didn't like how you were playing?
> A:      Yep. And mushed me in the face again.

(Davis Dep. 18:11–19:11).

Davis claims Officer Davies had to have seen the push because of his great basketball skills – "You know, the way I play, I bring a lot of tension, because – I ain't saying I'm great. And I just bring entertainment to the yard." (Davis Dep. 20:1-6).

8

When asked if he told Officer Davies about the push Davis's first response was, "She seen it.  I wouldn't have to tell her."  (Davis Dep. 20:22).  He then responded, "Plus, I did mention it to her.  I did both."  (Davis Dep. 20:23).

After the Second Basketball Incident, Davis did not file a sick call slip claiming that he was injured.  He also did not file a grievance until almost two months later.  (Exhibit I; Davis Dep. 22:14-18).

<u>May 31 Breakfast Fight</u>

Approximately two weeks after the First and Second Basketball Incidents, on May 31, 2004, Davis and Casey had an encounter during breakfast.  After receiving his first plate of food, Davis decided to get in line for seconds.  While standing in the seconds line Casey approached Davis, tried to get ahead of Davis in line and called Davis a child molester.  Afterwards Davis and Casey began arguing.  (Davis Dep. 25:16 – 27:5).  When Davis turned around to get his food Casey hit him in the jaw.  (Davis Dep. 27:8-19).  After Casey hit him, Davis "ran [Casey] down" and hit him back (the "May 31 Breakfast Fight").  (Davis Dep. 13:14-15, 27:18-19).

Upon seeing the fight, Officer Jermaine McReynolds did what he was "supposed to do" and called a Code 8 requesting assistance to stop the fight.  (Davis Dep. 34:1-14; Exhibit B – Incident Reports).  Officers responded to the code and stopped the fight.  (Davis Dep. 34:15-16; Exhibit B). Officers then immediately took Davis to the infirmary.  (Davis Dep. 28:22-23).

<u>Medical Treatment</u>

At the infirmary Nurse Jeremy examined Davis.  (Davis Dep. 29:3, 76:17-24).  Nurse Jeremy found that Davis was able to open and close his mouth fully and talk

clearly. (Exhibit C – Progress Notes). Based on the examination, Nurse Jeremy gave Davis gauze to absorb the blood, Motrin for pain and ice. (*Id.*). Nurse Jeremy also made a note that he was referring Davis to a "mid level provider for 6-1-04". (*Id.*). He then sent Davis back to the tier. (Davis Dep. 29:7-8). A few hours after Davis left the infirmary, medical records indicate that a nurse examined Davis again on the tier. (Exhibit C).

The day following the May 31 Breakfast Fight Davis was taken for an x-ray of his jaw at St. Francis Hospital. (Exhibit D – Radiologic Consult). The results of the x-ray indicate that Davis had a "bilateral mandibular fracture…." (*Id.*). Davis's housing report shows that after the x-ray Davis was taken back to HRYCI and housed in the infirmary. (Exhibit E – Davis Housing Report at p2). Less than two weeks later, on June 11, 2004, Davis received surgery to repair his jaw. (Exhibit F). Following the surgery, Davis was taken to HRYCI where he remained in the infirmary until on or about July 5, 2004. (See Exhibit E at p2-3).

<u>The Investigation</u>

Following the incident, the officers involved in stopping the fight filed incident reports detailing the events that occurred. (Exhibit B). In addition Officer Pervone Cropper investigated the events surrounding the incident. (Exhibit G – Emig Affidavit; Davis Dep. 61:16-24). As a result of the fight Casey received a sanction of fifteen days in isolated confinement for hitting Davis. (Exhibit H – Casey Disciplinary).

Sometime after the May 31 Breakfast Fight Davis requested that Deputy Warden Emig, who at that time served as Facility Investigator, ask the Attorney General's office to pursue criminal charges against Casey. (Exhibit G at ¶ 5). In

accordance with procedure and in response to Davis's request, Deputy Warden Emig submitted information to the Attorney General's office regarding the May 31 Breakfast Fight. (*Id.* at ¶ 7). The Attorney General's Office responded that they would not pursue charges against Casey because the inmates were fighting. (*Id.* at ¶ 8). The Attorney General's Office further concluded that the matter would best be handled internally by the facility. (*Id.*).

The Grievance

On July 16, 2004, two months after the First and Second Basketball Incidents and a month and a half after the May 31 Breakfast Fight, Davis had an inmate write him a grievance about the events that had occurred. (Davis Dep. 71:4-6; Exhibit I - Grievance). In the grievance Davis grieved the First Basketball Incident, the Second Basketball Incident and the May 31 Breakfast Fight. Davis requested that, "someone … look into this matter to see why Officer Daves and Maze didn't do anything to Mr. Casey and why this Incident wasn't documented." Then, in a different handwriting is written, "I would like to press charges on Casey." (Exhibit I).

On August 6, 2004, Sergeant Mary Moody, the Inmate Grievance Chairperson responded to Davis's grievance. She informed Davis that he could not request or demand disciplinary action on staff but that he should write a complaint to Captain Bamford. (Exhibit I). Sgt. Moody also told Davis that his action request was inappropriate or not complete and that he must make an actual request. (*Id.*). Davis received the response and was satisfied with the grievance and did not pursue it further.

> Q (DAG):     Did you file a grievance?
> A (Davis):    No. The only grievance I filed is – I
> filed a grievance, but it wasn't like particular to that. It was

11

the officers – their conduct.   And that's what I filed a grievance on – their conduct.

Q:      When did you file this grievance?

A:      I don't know the specific day.

Q:      But you did file a grievance –

A:      And they said I can't – you know, you can file a grievance.   Then they ask what you want done – the actions you want done.   And I guess, what I asked for, they said you can't do it.   So I was all right with it.   At least I did file the grievance, you know.   And I guess if you're not satisfied with the finding of their answer, then my knowledge that I – somebody told me, because I don't know too much about it, you take it to the next level.   But I was satisfied with the answer they gave me.

Q:      So you were satisfied with the results of the grievance?

A:      Right.

(Davis Dep. 22:14-23:10).

Despite his satisfaction with the results of the grievance, on February 9, 2005, Davis filed the Original Complaint.

## ARGUMENT

Federal Rule 56(c) permits a Court to grant summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To obtain summary judgment the moving party must demonstrate that he has met the standards of Rule 56(c). *Carter v. Exxon Company USA*, 177 F.3d 197, 202 (3d Cir. 1999). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Thus only disputes that affect the outcome of a lawsuit properly preclude the grant of summary judgment. *Id.*

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In deciding a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252.

The record in this case clearly demonstrates that Davis cannot prove that State Defendants violated his constitutional rights. First, State Defendants are immune from liability for Davis's claims in both their official and individual capacities. Second, Davis failed to exhaust the administrative remedies available to him at HRYCI prior to filing his lawsuit. Third, Davis cannot prevail on his claims against Warden Williams

13

based solely on the theory of respondeat superior.  Fourth, Davis cannot maintain an action under 42 U.S.C. § 1983 against Warden Williams where Warden Williams played no affirmative role in the alleged deprivation of Davis's rights.  Finally, Davis's bald and unsubstantiated allegations are not supported by the record and no fair minded jury could return a verdict for Davis.  For all of the foregoing reasons State Defendants' Motion for Summary Judgment should be granted and Davis's Complaint dismissed.

I.      **State Defendants Are Immune From Liability In Their Official Capacities Pursuant To The Eleventh Amendment.**

Davis seeks to hold the State Defendants liable in their official capacities for the alleged constitutional violations.  To the extent he seeks to hold them liable in their official capacities the State Defendants are immune from liability under the Eleventh Amendment.

The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Although the Eleventh Amendment does not, by its explicit terms, bar suits against a State by its own citizens, the United States Supreme Court has held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).  Further where a State is not a named party in an action a suit may still be barred by the Eleventh Amendment where "'the action is in essence one for the recovery of money from the state,'" because "'the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit

14

even though individual officials are nominal defendants.'" *Id.* (quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464 (1945)).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64 (1996). The United States Congress, however, can waive a state's sovereign immunity, and therefore, its Eleventh Amendment immunity, through the Fourteenth Amendment. *Id.* But, only a clear indication of Congress's intent to waive a state's immunity will produce this result. *Id.*

Title 42, section 1983 of the United States Code – the section under which Davis brings his lawsuit – does not display a clear intent by Congress to waive a state's sovereign immunity. In fact, Congress's intent appears to be to the contrary as the statute facially allows suits only to be brought against persons. 42 *U.S.C.* § 1983. The State of Delaware is not considered a "person" as contemplated by 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Therefore the Eleventh Amendment and the state's sovereign immunity protect the State of Delaware from liability for claims brought by an individual filing a lawsuit pursuant to § 1983. *See, id.*

A suit against a state official in his official capacity is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Thus an immunity that is available to the State is also available to a state official in his official capacity. *Id.* Under federal law, the State Defendants in their official capacities, like the State of Delaware, are not "persons" for the purposes of 42 U.S.C. § 1983. *Will*, 491 U.S. at 71. Because the State Defendants are not "persons" for purposes of § 1983, the Eleventh Amendment and the State of Delaware's sovereign immunity protect the State Defendants from

liability. As a result, this Court lacks jurisdiction over the State Defendants in their official capacities, and the State Defendants are outside the class of persons subject to liability under § 1983. Therefore Davis cannot maintain his claims against the State Defendants in their official capacities and summary judgment is appropriate.

## II.    Davis Did Not Exhaust The Administrative Remedies Available To Him. Therefore His Claims Should Be Dismissed Under The PLRA.

In addition to the State Defendants' immunity preventing liability for his claims, Davis is prohibited from bringing his claims because he failed to exhaust HRYCI's administrative remedies as mandated by the Prison Litigation Reform Act ("PLRA") of 1995.

The PLRA amended a variety of statutory provisions governing litigation by prisoners, including provisions under 42 *U.S.C.* § 1983. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Incarcerated individuals challenging the conditions under which they are confined must meet the statutory provisions governing exhaustion as outlined by the PLRA. *Id.*

Title 42, Section 1997e(a) of the United States Code, as amended by the PLRA, states that, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 *U.S.C.* § 1997e(a). Section 1997e(a) in its current form is drastically different from its predecessor. The preceding statute made exhaustion discretionary. The PLRA, however, changed the statute so that exhaustion is now mandatory. *Porter*, 534 U.S. at 524. Thus, "exhaustion is now <u>required</u> for all action[s] brought with respect to prison conditions." *Id.* (emphasis added).

16

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532. Congress's purpose in enacting the mandatory exhaustion requirement was to "eliminate unwarranted federal-court interference with the administration of prisons, ...." *Woodford v. Ngo*, -- U.S. --, 126 S.Ct. 2378, 2387 (2006). Thus the exhaustion requirement, "afford[s] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 525.

The remedies prison officials provide to a prisoner need not meet federal standards nor be speedy and effective. *Id.* at 524. But a prisoner must utilize all steps of the procedure. *Id.* Even when a prisoner seeks relief not available in grievance proceedings, such as money damages, exhaustion is still a prerequisite to suit. *Id.*

Davis's claims clearly fall within the confines of the PLRA and the exhaustion requirement. The Complaints challenge the protection the State Defendants afforded Davis and the medical treatment he received during events that occurred while he was incarcerated. Such claims are challenging conditions of confinement and thus, clearly fall under the mandates of the PLRA. As such, Davis was required to exhaust the administrative remedies available to him at HRYCI prior to filing his § 1983 action.

The record reflects that Davis failed to exhaust the administrative remedies available to him at HRYCI. HRYCI has a grievance process and procedure that is codified at DOC Procedure Number 4.4 which is entitled "Inmate Grievance Procedure." (Exhibit J). Under Procedure 4.4, an inmate who wishes to grieve a particular issue must first express the grievance in writing. The grievance process is then

separated into three steps.  First, the grievance is reviewed by the Institutional Grievance Chair ("IGC").  If the grievance is unresolved by the IGC the grievant is then entitled to move to step two – a hearing before the Resident Grievance Committee ("RGC").  The RGC then arrives at a conclusion which is forwarded to the Warden or the Warden's designee for review and concurrence.  If the RGC fails to obtain the concurrence of the Warden, the grievant is entitled to review of his grievance by the Bureau Grievance Officer ("BGO").  It is only when all of these steps are completed that an inmate at HRYCI has exhausted all available administrative remedies.

Davis knew about Procedure 4.4 but failed to follow all three steps of the process.  On July 16, 2004 – over one month after the incidents alleged in the Complaints occurred – Davis filed the only grievance related to the Complaints.  (Exhibit I; Davis Dep. 22:14-18).  Davis admits that he did not write the grievance himself.  Rather he had another inmate, whose name he does not know, write the grievance.  (Davis Dep. 70:21-71:6).  In the grievance the writer grieves the First Basketball Incident, the Second Basketball Incident and the May 31 Breakfast Fight.  There are no dates listed in the grievance about when the incidents occurred and the timeline of events differs from what Davis now says occurred.  (Exhibit I).  Davis's requested relief in the grievance is that he, "would like someone to look into this matter to see why Officer Daves and Maze didn't do anything to Mr. Casey and why this Incident wasn't documented."  Then, in a different handwriting is written, "I would like to press charges on Casey."  (*Id.*).

In response to Davis's grievance, Sgt. Mary Moody, the IGC, wrote Davis that he cannot request or demand disciplinary action on staff but that he should write a complaint to Captain Bamford.  (*Id.*).  Sgt. Moody also told Davis that his action request

18

was inappropriate or not complete and that he must make an actual request.  (*Id.*).  Thus Davis's grievance was unresolved.

Davis admits to receiving the response from Sgt. Moody.  (Davis Dep. 72:22-73:10).  Davis also admits that he knew that he could proceed to the next level. But, despite receiving her response and knowing he could proceed with his grievance, Davis did not avail himself of these procedures because he was satisfied with the results of the grievance.  (Davis Dep. 23, 74:21-23).

> Q (DAG):     Did you file a grievance?
> A (Davis):     No.  The only grievance I filed is – I filed a grievance, but it wasn't like particular to that.  It was the officers – their conduct.  And that's what I filed a grievance on – their conduct.
> Q:     When did you file this grievance?
> A:     I don't know the specific day.
> Q:     But you did file a grievance –
> A:     And they said I can't – you know, you can file a grievance.  Then they ask what you want done – the actions you want done.  And I guess, what I asked for, they said you can't do it.  So I was all right with it.  At least I did file the grievance, you know.  And I guess if you're not satisfied with the finding of their answer, then my knowledge that I – somebody told me, because I don't know too much about it, you take it to the next level.  But I was satisfied with the answer they gave me.
> Q:     So you were satisfied with the results of the grievance?
> A:     Right.

(Davis Dep. 22:14-23:10).

Despite being aware of the procedure, Davis never requested a hearing before the RGC or in any way appealed the denial of the grievance. When asked to explain his reason for not following the steps in the process Davis's response was simply that he "was satisfied with it."  (Davis Dep. 75:1).

Davis failed to exhaust all administrative remedies available to him at HRYCI. According to the PLRA, Davis's failure to exhaust all administrative remedies is fatal to his lawsuit. Therefore his claims should be dismissed in accordance with the PLRA.

III.    **Warden Williams Cannot Be Held Liable For Davis's Claims Based Solely On The Theory Of Respondeat Superior.**

Assuming, *arguendo*, that Davis is able to establish that he has satisfied the mandatory exhaustion requirement of the PLRA, his claims against Warden Williams should fail because he cannot maintain a claim solely on the basis of respondeat superior.

In a § 1983 action a supervisory official cannot be held liable solely under the theory of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, in order to establish supervisory responsibility a plaintiff must show that the defendant was the moving force behind the alleged constitutional violation. *Sample v. Diecks*, 885 F.2d 1099, 1116-17 (3d Cir. 1989). "[A] 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person' … has exhibited deliberate indifference to the plight of the person deprived." *Id.* at 1118.

Davis argues that Warden Williams should be held liable, "Because he's in charge of any harassment dealing with sexual harassments, like my situation, [Casey] calling me a child molester." (Davis Dep. 8:17-20). Davis's lawsuit against Warden Williams is based solely on Warden Williams's supervisory responsibilities which is prohibited under § 1983.

Further Davis cannot establish that Warden Williams was deliberately indifferent to his plight. Davis never personally informed Warden Williams that Casey was calling him a child molester. (Davis Dep. 10:4-11:7). In addition Davis did not

notify the Warden that he believed Casey wanted to cause him harm. In fact, the only letter Davis sent to Warden Williams regarding the alleged incidents was the third page of the Amended Complaint. (Davis Dep. 45:5-14). Clearly this "letter", written by someone other than Davis, was written after the First and Second Basketball Incidents and after the May 31 Breakfast Fight with Casey. Given that Davis did not alert Warden Williams to his alleged plight until after the alleged events occurred, Warden Williams could not have been the moving force behind the alleged deprivation of Davis's rights nor could he have been deliberately indifferent to Davis's plight. Therefore Davis cannot establish supervisory responsibility on the part of Warden Williams.

Davis cannot support a claim against Warden Williams based solely on the theory of supervisory responsibility. Further Davis cannot show that Warden Williams was deliberately indifferent to his plight. Therefore the claims against Warden Williams should be dismissed.

**IV.     Warden Williams Cannot Be Held Liable Where He Had No Personal Involvement In The Alleged Deprivation Of Davis's Rights.**

In addition to not having a claim against Warden Williams based solely on respondeat superior, Davis also has no claim against Warden Williams because the Warden was not personally involved in the events alleged in the Complaints.

To support a claim for a civil rights violation under § 1983 a plaintiff must show that the accused defendant had *personal involvement* in the alleged wrongs. *Rode*, 845 F.2d at 1207 (emphasis added). A plaintiff must prove that the official "played an affirmative role in the deprivation of the plaintiffs' rights, i.e., there must be a causal link between the actions of the responsible officials named and the challenged misconduct."

*Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981) (Garth, J. concurring in part, dissenting in part). In addition, this Court has held that, "Grievances are not enough to impute knowledge to [a] defendant." *Brookins v. Williams*, 402 F.Supp.2d 508, 512 (D. Del. 2005) (quoting *Rode*, 845 F.2d at 1208)). Rather to establish liability, a plaintiff must prove that a defendant personally directed, had actual knowledge of, or acquiesced in the alleged deprivation of his constitutional rights. *Rode*, 845 F.2d at 1207. Without such proof the defendant cannot be held liable. *See Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990).

Warden Williams had no personal involvement in the allegations in Plaintiff's Complaints. Davis admits that the only officer on the basketball court during the First Basketball Incident was Officer Mays. (Davis Dep. 75:4-10). Davis also concedes that the only officer present during the Second Basketball Incident was Officer Davies. (Davis Dep. 19:2-5). Therefore Warden Williams had no involvement in these two events and cannot be held liable for claims arising from them.

With respect to the May 31 Breakfast Fight with Casey, Davis admits that Warden Williams did not witness the fight between Davis and Casey. (Davis Dep. 44:3-4). Further, Warden Williams had no involvement in breaking up the fight, taking Davis to the infirmary or providing Davis with medical care following the fight. Therefore Warden Williams played no affirmative role in the alleged deprivation of Davis's rights and cannot be held liable for Davis's claims.

**V.**        **Davis's Bald And Unsubstantiated Allegations Are Not Supported By The Record.  Therefore No Fair Minded Jury Could Return A Verdict For Davis On The Failure To Protect, Deliberate Indifference Or Failure To Investigate Claims.**

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, …" which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323-25 (1986).  An issue is "genuine" only if there is sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 249.  A factual dispute is "material" only if it might affect the outcome of the suit under governing law.  *Id.* at 248.

In deciding a motion for summary judgment "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Id.* at 252.  Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, -- U.S. --, 127 S.Ct. 1769, 1776 (2007).  In this case, the facts clearly show that there is no genuine issue of material fact as to Davis's claims of failure to protect, deliberate indifference and failure to investigate against the State Defendants.  Therefore this Court should grant the State Defendants' Motion for Summary Judgment.

A.    **The State Defendants did not violate Davis's constitutional right to protection.**

Davis alleges that the State Defendants failed to protect him from Casey on three separate occasions:  1) the First Basketball Incident where Officer Mays was present; 2) the Second Basketball Incident where Officer Davies was present; and 3) the May 31 Breakfast Fight with Inmate Casey.  Because Davis cannot establish the elements of a failure to protect claim for any of these incidents, his claims should be dismissed.

Correction officials have a duty under the Eighth Amendment to take reasonable measures, "'to protect prisoners from violence at the hands of other prisoners.'"  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).  But, "it is not … every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety."  *Id.* at 834.  Only "a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Id.* at 828.

To prevail on an Eighth Amendment failure to protect claim a plaintiff must prove two requirements.  "First, the prisoner must demonstrate 'that he is incarcerated under conditions posing a substantial risk of serious harm.'"  *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer*, 511 U.S. at 834).  "Second, the prison officials involved must have a sufficiently culpable state of mind."  *Id.* "Specifically, the inmate must show that the official 'knows of and disregards an excessive risk to inmate health or safety;  the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

24

must also draw the inference.'"  *Id.* (quoting *Farmer*, 511 U.S. at 838).  Davis cannot

establish the requirements for a failure to protect claim with respect to any of the

incidents alleged in his Complaints.    Therefore this Court should grant the State

Defendants' Motion for Summary Judgment.

>    1.  First Basketball Incident

Davis claims that during the First Basketball Incident he was playing

basketball with approximately 15 other inmates during recreation time in the yard.

Officer Mays was the officer supervising the basketball game.  (Davis Dep. 15:1-10).

Davis contends that during the basketball game Casey pushed or "mushed" him in the

face.  Davis, however, admits that the push occurred because the game was competitive.

> Q (DAG):    How many inmates were out in the yard
> while you were playing basketball?
> A (Davis):    Roughly, 15.
> Q:    How many officers were out there?
> A:    One.
> Q:    Who was the officer?
> A:    One occasion was Officer Mayes, and the second
> one – occasion was Officer Davies.
> Q:    So on the first occasion it was Officer Mayes?
> A:    Yes.
> Q:    Okay.  Were you playing basketball?
> A:    Yes.
> Q:    Was Mr. Casey playing basketball?
> A:    Yes.
> Q:    So how did it happen that he pushed you in the
> face?
> A:    That he – he mushed me.  Well, pushed, mushed.
> Right.  Because basketball is a competitive sport – and a lot
> of people – if somebody is dominating the game and other
> people instigating things, the other party don't like it.  And
> me being an aggressive player and having fun – I like
> having fun.  And some people don't like it.  And they do all
> their power to try to stop you from scoring.

(Davis Dep. 15: 1-24).

Davis's recollection of the events that occurred during the First Basketball Incident does not support a failure to protect claim. First, the alleged push in the face by Casey did not pose a substantial risk to Davis's safety. Davis admits that the push occurred during a game of basketball in which he was being an aggressive player. He further admits that, "it was just a mush. … a lot of people take that as not that serious…." (Davis Dep. 17:18-19). Davis was not injured as a result of the alleged push – he did not file a sick call slip nor did he file a grievance immediately after the incident. (Davis Dep. 23:13-21). Davis's actions clearly demonstrate that the alleged push by Casey during a competitive game of basketball did not pose a substantial risk of serious harm to him. Thus Davis cannot satisfy the first requirement for a failure to protect claim.

Davis also cannot satisfy the second element of a failure to protect claim. Officer Mays did not knowingly disregard an excessive risk to Davis's safety. Officer Mays could not have known that there was a risk to Davis's safety. The push occurred when approximately 15 inmates were playing a basketball game. Davis suffered no injury as a result of the alleged push and admits that the push was not serious.

Davis contends that at some point, although he does not recall when, he told Officer Mays that Casey was calling him a child molester. Therefore, Davis asserts, Officer Mays should have known that there was a reason to protect Davis after the push in the face. But Davis's allegations are not supported by the record. First Davis cannot recall an exact date when he told Officer Mays that Casey called him a child molester. Therefore there is no evidence to prove that Officer Mays knew of the name calling before the game. Second, even if Officer Mays knew Davis was being called a child

molester, Davis evidently did not think Casey would cause him harm because he voluntarily played the basketball game with Casey – Officer Mays did not force Davis to play basketball. Thus Officer Mays had no reason to believe that Davis thought Casey would cause him harm. Finally Davis himself admits that the push was "just a mush" and "not that serious". Therefore, by his own admission, there was no excessive risk to his safety.

The facts surrounding the First Basketball Incident clearly show that Casey's contact with Davis during the basketball game was a result of Davis's aggressive basketball playing. Further the "mush" was not serious. Therefore, a fair minded jury could not return a verdict in favor of Davis and the claim of failure to protect against Officer Mays should be dismissed.

2. Second Basketball Incident

Like the First Basketball Incident, the Second Basketball Incident occurred between Davis and Casey during a basketball game. Davis asserts that during the Second Basketball Incident approximately ten inmates were playing basketball while Officer Davies was supervising. (Davis Dep. 18:11-19:5). He asserts that Casey again pushed him during the basketball game and Officer Davies saw the push and did not report it. (Davis Dep. 19:6-21:8).

To the extent the alleged push by Casey occurred the second time, the push did not pose a substantial risk to Davis's safety. Again Davis's testimony reveals that the push occurred during another competitive basketball game.

> Q (DAG):    Okay. Now the second incident was also on the baskeball court?
> A (Davis):    Yes.

Q:      Tell me how many inmates do you remember were out then.

A:      Probably the same.  You know, I don't know.  It's not my job to count them.  That wouldn't even make sense.

Q:      But you weren't the only inmate out there?

A:      No.

Q:      Okay.  Was it more than five?

A:      Yeah.  There was more than five.

Q:      More than ten?

A:      Yea.  I mean, just ten.  Like I say, it's not crowded.  There's not a lot of people out there.

Q:      How many officers were out there?

A:      One.

Q:      Who was that officer?

A:      Davies.

Q:      What happened in this instance?

A:      Same thing.

Q:      So you were playing basketball?

A:      Yep.  And he did it again.

Q:      And Casey didn't like how you were playing?

A:      Yep.  And mushed me in the face again.

(Davis Dep. 18:11-19:11).

Clearly the alleged push during the Second Basketball Incident happened as a result of the game.  Although Davis alleges that the push resulted from Casey calling him a child molester this allegation is not supported by Davis's own testimony.

Q (DAG):      So you were playing basketball?

A (Davis):      Yep.  And he did it again.

Q:      And Casey didn't like how you were playing?

A:      Yep.  And mushed me in the face again.

Q:      Because of the game?

A:      Well, between that and calling – he been calling me a "child molester."  Same.  It just came to a head.  And he wanted to fight me, but I don't want to fight.

Q:      Did he call you a "child molester" while you were playing basketball?

A:      No, no.

(Davis Dep. 19:8-19)

28

Casey made no mention of the words "child molester" during the Second Basketball Incident. Therefore there is nothing to support Davis's allegation that Casey hit him because he was calling him a "child molester". Rather, the evidence shows that Casey pushed Davis because of Davis's aggressive playing during the basketball game.

After the alleged "mush", Davis did not complain of being hurt, nor did he file a sick call slip. Further Davis did not file a grievance until approximately two months after the incident. Clearly Davis did not think the push posed a substantial risk to his safety. As a result he cannot meet the first element of a failure to protect claim.

Davis also cannot prove the second requirement of a failure to protect claim. Davis has no proof that Officer Davies saw the push in the face. Davis contends that Officer Davies saw the hit because, "the way I play, I bring a lot of tension, because – I ain't saying I'm great. And I just bring entertainment to the yard." (Davis Dep. 20:4-7). But, Davis's self-reported basketball skills are hardly sufficient evidence to prove that Officer Davies witnessed the "mush".

Moreover the facts of the case show that there was no reason for Officer Davies to believe that Davis was in danger of substantial harm. Like the First Basketball Incident, Davis chose to participate in the second basketball game – no one required Davis to play with Casey. If Davis was truly afraid that Casey was going to hurt him or if he truly believed that he was in danger, he would not have elected to participate in another basketball game with Casey. But Davis willingly and knowingly played basketball with Casey, proving that Davis did not believe he was at risk of being harmed. Davis's own actions of voluntarily entering into a second basketball game with Casey are proof that Davis did not consider Casey a threat. Therefore Officer Davies could not

29

have drawn the conclusion that a substantial risk of serious harm existed and the claims against Officer Davies should be dismissed.

### 3.  May 31 Breakfast Fight

Davis cannot prove the State Defendants should be held liable for failure to protect during the May 31 Breakfast Fight with Casey.  First, Davis cannot show that the conditions of his confinement posed a substantial risk of serious harm.  Davis alleges that Casey was calling him a child molester and that because of the name calling he was incarcerated under conditions posing a substantial risk of serious harm.  The problem with Davis's argument, however, is that by his own admission he is serving a sentence for charges related to a burglary, not child molestation.  (Davis Dep. 12:2).  Thus, being subjected to name calling that had no factual basis did not place Davis at substantial risk of harm.

Subjectively, the State Defendants would have no reason to believe Davis was in danger.  First, he was not incarcerated for an offense against a child such as child molestation.  Second, the prior incidents with Casey on the basketball court, without anything more, were not sufficient to cause the State Defendants to draw the inference that Casey would cause Davis future harm – especially where Davis continued to play basketball with Casey.  Third, Davis never filed a single letter or grievance stating that he was afraid of Casey or that his safety was in danger until after the incidents occurred.  Given the facts of this case there is nothing to prove that the State Defendants were subjectively aware of a risk to Davis's safety and that they knowingly disregarded that risk.  Therefore Davis cannot prove the elements of a failure to protect claim and his claim should be dismissed.

**B.** **The State Defendants provided Davis access to medical attention and treatment and were not deliberately indifferent to his medical needs.**

Davis alleges that after the May 31 Breakfast Fight with Casey, the State Defendants refused him medical treatment. The evidence, however, plainly contradicts Davis's version of the facts and shows that the State Defendants provided Davis access to medical attention immediately following his fight with Casey.

Prison systems must provide prisoners with adequate medical care. *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). "In order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show 'deliberate indifference' to a serious medical need." *Id.*

To demonstrate a cognizable claim of deliberate indifference under the Eighth Amendment a prisoner must prove that, (1) the defendant was deliberately indifferent to his medical needs; and (2) his medical needs were serious. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

In this case, the State Defendants were not deliberately indifferent to Davis's medical needs. Records show that the officers present during the May 31 Fight immediately took Davis to the infirmary following cessation of the fight. (Exhibits B & C). Further, Davis himself admits that he was taken to the infirmary immediately following the fight and examined by a nurse. (Davis Dep. 28:22-23). Approximately three hours after he left the infirmary a nurse visited Davis on the tier and examined him again. (Exhibit C). The evidence also shows that the day after the fight, Davis received an x-ray of his jaw at St. Francis Hospital. (Exhibit D). Following his x-ray, Davis was transported back to HRYCI and housed in the infirmary. (Exhibit E). Davis received

31

surgery on his jaw on or about June 11, 2004 – less than two weeks after the May 31 Breakfast Fight.  (Exhibit F).  Following the surgery, Davis was transported back to HRYCI's infirmary.  Davis remained in the infirmary at HRYCI until discharged on or about July 6, 2004.  (Exhibit E).

It is undisputed that State Defendants afforded Davis access to prompt medical attention and treatment immediately following the May 31 Breakfast Fight with Casey.  Therefore Davis cannot prove the State Defendants were deliberately indifferent to his medical needs and this claim should be dismissed.

C.     **The State Defendants investigated the events alleged in Davis's Complaints.  Moreover any failure to investigate does not constitute a violation of Davis's constitutional rights.**

Davis asserts that he filed the lawsuit against Deputy Warden Emig because Deputy Warden Emig did not forward the information regarding the fight to the attorney general's office and because Deputy Warden Emig did not conduct an investigation.  (Davis Dep. 36:2-16).  Davis's allegations against Deputy Warden Emig do not rise to the level of a constitutional violation.  Therefore Davis cannot maintain an action against Deputy Warden Emig under § 1983.

Further, to the extent Davis has asserted a constitutional claim against Deputy Warden Emig, the evidence fails to support his allegations.  Records from HRYCI reflect that on the same day as the May 31 Breakfast Fight, the officers involved in the incident filed Incident Reports detailing the events that occurred.  (Exhibit B).  Moreover Officer Provone Cropper conducted an investigation into the events surrounding the fight.  (Emig Affidavit at ¶ 4).  Davis concedes that he was interviewed

by Officer Cropper for this investigation.  (Davis Dep. 61:16-24).  Therefore Deputy Warden Emig did have the incident investigated.

Davis also contends that Deputy Warden Emig violated his constitutional rights by not prosecuting Casey or informing the Attorney General's office about the incident.  Again Davis's allegations are false.  Following the May 31 Breakfast Fight, Deputy Warden Emig submitted information about the fight to the Attorney General's Office for a determination of whether they would pursue criminal charges against Casey. (Emig Affidavit at ¶ 7).  The Attorney General's Office, however, declined to pursue criminal charges concluding that the incident was best resolved internally at HRYCI.  (*Id.* at ¶ 8).  Deputy Warden Emig informed Davis about the Attorney General's decision. (*Id.*).  Therefore the evidence does not support Davis's allegations against Deputy Warden Emig and the claim should be dismissed.

**VI.      State Defendants Are Immune From Liability In Their Individual Capacities Pursuant To The Doctrine Of Qualified Immunity.**

In addition to sovereign immunity, the State Defendants are also protected from liability in their individual capacities by the doctrine of qualified immunity.  The doctrine of qualified immunity holds that government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A right is clearly established when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Furthermore, state officials are entitled to qualified immunity where they acted in good faith, without gross or wanton negligence, in the

33

performance of discretionary duties.  *Vick v. Haller*, 512 A.2d 249 (1986) (*aff'd in part and rev'd in part on procedural grounds*).

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Thus a determination by the district court of whether qualified immunity applies should be made at the earliest possible stage "so that the costs and expenses of trial are avoided where the defense is dispositive."  *Id.* at 200-01.

In deciding a question of qualified immunity a district court is required to consider an initial inquiry:  "Taken in the light most favorable to the party asserting the injury do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  "If and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established … in light of the specific context of the case.'"  *Scott*, -- U.S. --, 127 S.Ct. at 1774.  In other words, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Creighton*, 483 U.S. at 640.  In this case, the evidence presented shows that the State Defendants are entitled to qualified immunity.

### A.    The facts alleged show that the State Defendants' conduct did not violate Davis's constitutional rights.

The facts of this case clearly demonstrate that the State Defendants' conduct did not violate Davis's constitutional rights.  As previously shown, Davis never told officers that he feared for his safety.  Further Davis's action of continually participating in basketball games with Casey prove that Davis did not believe Casey

would cause him harm.  Therefore Officer Mays and Officer Davies had no duty to protect Davis from Casey during the basketball incidents.

The State Defendants provided Davis access to medical treatment following the May 31 Breakfast Fight with Casey.  Officers escorted Davis to the infirmary where he was examined by the nurse on duty.  Following the examination at the infirmary Davis was again examined on the tier by a nurse.  The day after the fight Davis was taken for an x-ray of his jaw at St. Francis Hospital and he received surgery on his jaw less than two weeks later.  Clearly the State Defendants' conduct was not deliberately indifferent to Davis's medical needs and did not violate his constitutional rights.

Finally, officers at HRYCI investigated the May 31 Breakfast Fight and sanctioned Casey as a result of the fight.  Therefore the State Defendants did not fail to investigate the fight and did not violate Davis's constitutional rights.

Davis cannot prove the State Defendants violated his constitutional rights. Therefore the State Defendants are entitled to qualified immunity.

> **B.    Davis's rights were not clearly established such that the State Defendants understood that their conduct violated his rights.**

Assuming, *arguendo*, that Davis is able to establish the first factor of the test, he must also prove that his rights were clearly established at the time of the alleged violation.  In deciding the second issue a district court must ask "whether a reasonable public official would know his or her *specific conduct* violated clearly established rights." *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996).

In this case Davis's rights were not clearly established at the time of the alleged incidents.  First, Davis did not have a right to extra protection during the First and Second Basketball Incidents given that his actions do not demonstrate that he believed

Casey would cause him harm and he did not tell the officers that he believed Casey would cause him harm.

Second, although Davis can probably show a clearly established right to medical attention, as mentioned above, the State Defendants provided Davis access to medical attention. Therefore even if his right is clearly established, the State Defendants did not violate that right.

Finally, Davis cannot establish a clear right to an investigation or to have Casey charged with a crime. Davis has no constitutional right to an investigation of a fight that occurred while he was incarcerated at HRYCI. Moreover, to the extent he does have such a right, the State Defendants fulfilled that right by investigating the incident and sanctioning Casey for fighting.

The evidence shows that the State Defendants did not violate Davis's clearly established rights. Therefore the State Defendants are protected from liability in their individual capacities by the doctrine of qualified immunity.

## CONCLUSION

No fair minded jury could find on behalf of Davis for any of his claims. State Defendants are immune from liability for Davis's claims in their official and individual capacities. Further Davis is prevented from bringing his claims because he failed to follow the mandates of the PLRA. Moreover Davis has no claims against Warden Williams because he was not personally involved in the allegations in Davis's Complaints.

Finally, the State Defendants had no duty to protect Davis from Casey where Davis never notified the State Defendants that he feared he was in danger. Moreover, while the record shows that Davis suffered a fractured jaw, State Defendants provided Davis with immediate access to medical attention and treatment. State Defendants' actions were not deliberately indifferent to Davis's medical needs. The record also shows that the State Defendants investigated the May 31 Breakfast Fight and disciplined Casey for the fight. Therefore the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and the State Defendants are entitled to summary judgment on all claims.

# **CERTIFICATE OF SERVICE**

I, Erika Y. Tross, Esq., hereby certify that on October 15, 2007, I caused a true and correct copy of the attached ***State Defendants' Opening Brief In Support Of Their Motion For Summary Judgment*** to be filed using CM/ECF and to be served by electronic delivery. On October 16, 2007, all individuals listed below will be served in the form and manner indicated.

**Via First Class Mail**
Inmate William F. Davis, III
SBI #162762
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

**Via Hand Delivery**
Daniel L. McKenty, Esq.
McCullough & McKenty, P.A.
1225 N. King Street, Suite 1100
P.O. Box 397
Wilmington, DE 19899-0397

*/s/ Erika Y. Tross*
Erika Y. Tross (#4506)
Deputy Attorney General
Delaware Department of Justice
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-8400