IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WILLIAM F. DAVIS, III,              )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )
WARDEN RAPHAEL WILLIAMS,            )    Civil Action No.
FIRST CORRECTIONAL MEDICAL,         )      05-67-SLR
DR. BOSTON, BRIAN CASEY,            )
C/O DAVIES, CAPTAIN EMMIT,          )
C/O REGINALD MAYES, and             )
DEBRA MUSCARELLA,                   )
                                    )
        Defendants.                 )

        Deposition of WILLIAM FREDERICK DAVIS, III, taken
pursuant to notice at the Delaware Correctional Center,
1181 Paddock Road, Smyrna, Delaware, beginning at
10:00 a.m. on Wednesday, August 8, 2007, before
Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

        WILLIAM F. DAVIS, III (pro se)
        SBI# 162762
          Delaware Correctional Center
          1181 Paddock Road
          Smyrna, Delaware  19977
          for himself,

CORBETT & WILCOX
230 North Market Street – Wilmington, Delaware 19801
(302) 571-0510

Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

William Frederick Davis, III

2 (Pages 2 to 5)

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  APPEARANCES (CONT'D):
2      ERIKA Y. TROSS, ESQ.
       STATE OF DELAWARE DEPARTMENT OF JUSTICE
3          820 North French Street - 6th Floor
           Wilmington, Delaware 19801
4          for the Defendants Warden Raphael Williams,
           C/O Davies, Captain Emmit and C/O Reginald
5          Mayes,
6      GERALD J. HAGER, ESQ.
       HECKLER & FRABIZZIO, P.A.
7          800 Delaware Avenue - Suite 200
           Wilmington, Delaware 19801
8          for the Defendants First Correctional Medical
           and Debra Muscarella.
9          - - - - -
10             WILLIAM FREDERICK DAVIS, III,
11         the witness herein, having first been
12         duly sworn on oath, was examined and
13         testified as follows:
14             MS. TROSS:  This is the deposition of
15     Williams F. Davis, III, SBI No. 00162762.
16  BY MS. TROSS:
17     Q.  Mr. Davis, as I stated to you earlier, I
18  represent state defendants Raphael Williams, Officer
19  Kerry Davies, Captain Mark Emmit and Officer Reginald
20  Mayes.  Mr. Hager is going to introduce himself for the
21  record.
22             MR. HAGER:  I'm Gerald Hager, and I
23  represent the medical defendants that you've sued in this
24  case.

**Page 3**

1  BY MS. TROSS:
2     Q.  I'm going to explain to you a little bit about
3  what a deposition is.  A deposition is part of the
4  discovery process.  It's a series of questions.  And your
5  answers are being given under oath.  And it's subject to
6  the laws relating to perjury.  You can object to any
7  question I ask, but you still must answer the question.
8             The transcriptionist, or court reporter,
9  will be taking down all of my questions and all of your
10  answers.  Therefore, we have to speak one at a time,
11  because the court reporter cannot take down what is being
12  said if we are talking over one another.
13     A.  All right.
14     Q.  Also all of the responses must be verbal.  The
15  court reporter cannot take down a nod of the head or
16  saying uh-huh.  So please say yes or no if the question
17  requires a yes or no answer.
18     A.  Simple enough.
19     Q.  Okay.  I will assume that if you answer a
20  question that you've understood the question.  If you do
21  not understand a question, ask me for clarification
22  before you answer.
23             A few other things:  You're allowed to
24  take breaks.  So if you need to take a break or use the

**Page 4**

1  bathroom, please let me know, and I'll get one of the
2  officers to assist you.  I will give you time at the end
3  to add anything that you think I should know that we did
4  not cover.
5             Finally, I need to know:  Are you taking
6  any medication or drugs which clouds your judgment or
7  prevents you from understanding questions and giving
8  honest answers?
9     A.  No.  I'm not nodding the head.
10     Q.  All right.  Let's talk a little about some of
11  your background history.  What is your full name?
12     A.  William F. Davis.  William Frederick Davis,
13  III.
14     Q.  Have you ever used any other names or aliases?
15     A.  No.
16     Q.  Have you ever gone by any nickname or street
17  name?
18     A.  No.
19     Q.  Did you bring anything with you to this
20  deposition?
21     A.  No.
22     Q.  Did you review anything in preparation for the
23  deposition?
24     A.  No.

**Page 5**

1     Q.  Did you look at anything?
2     A.  No.
3     Q.  Were you shown anything?
4     A.  No.
5     Q.  Were you told anything?
6     A.  No.  I know the facts, so I don't have to go
7  through all that.  It's fresh in my memory what happened.
8     Q.  Have you ever been deposed before?
9     A.  No.
10     Q.  Have you ever testified in court before?
11     A.  No.
12     Q.  Have you ever filed a civil lawsuit besides
13  this one?
14     A.  Yes.
15     Q.  In what court?
16     A.  Same court.  U.S. District Court.
17     Q.  Delaware?
18     A.  Yes.
19     Q.  Why did you file the previous lawsuit?
20     A.  Medical.  They didn't take care of me
21  properly.
22     Q.  Was it related to a lawsuit while you were in
23  prison?
24     A.  What you mean?

William Frederick Davis, III

3 (Pages 6 to 9)

| Page 6 | Page 8 |
|---|---|
| 1  Q. Did you file it against FCM or CMS? | 1  Q. In what institution are you currently being |
| 2  A. Yes. Right. | 2  housed? |
| 3  Q. It was against who? | 3  A. DCC. |
| 4  A. Both. | 4  Q. Okay. What pod? |
| 5  Q. FCM and CMS? | 5  A. T2. |
| 6  A. Yes. | 6  Q. How long have you been in DCC? |
| 7  Q. When did you file the previous lawsuit? | 7  A. Two years. And two years in Gander Hill. |
| 8  A. September something. I can't remember the | 8  Q. You were at Gander Hill prior to -- |
| 9  exact date. | 9  A. Yes. |
| 10  Q. Was it this year? | 10  Q. -- DCC? |
| 11  A. No. 2002. | 11  A. Yes. |
| 12  Q. 2002. | 12  Q. Okay. Let's talk a little bit about your |
| 13      What was the outcome of that lawsuit? | 13  lawsuit. Who is Raphael Williams? |
| 14  A. Still going -- still ongoing. | 14  A. The warden. |
| 15  Q. What is your date of birth? | 15  Q. The warden of what institution? |
| 16  A. November the 7th, 1960. | 16  A. Gander Hill. |
| 17  Q. Where were you born? | 17  Q. Why is he a defendant in your lawsuit? |
| 18  A. West Chester. | 18  A. Because he's in charge of any harassment |
| 19  Q. Pennsylvania? | 19  dealing with sexual harassments, like my situation, |
| 20  A. Yes. | 20  calling me a child molester. And that's a serious thing |
| 21  Q. Where did you grow up? | 21  being incarcerated. So he should have been notified. |
| 22  A. Wilmington, New Castle. Both. Half and half. | 22  Q. Can you give me a physical description of |
| 23  Q. Prior to your incarceration where did you | 23  Warden Williams? A physical description -- his height, |
| 24  live? Prior to your current incarcerations. | 24  his hair color. |

| Page 7 | Page 9 |
|---|---|
| 1  A. Wilmington. | 1  A. Oh, I know he's been in the system for a lot |
| 2  Q. How long were you a resident there? | 2  of years. He's tall. He's an Indian. Brown skin, dark |
| 3  A. Twenty years, I think. Something like that. | 3  hair. I definitely know him. |
| 4  Q. Who did you live with? | 4  Q. Do you understand the difference between what |
| 5  A. My mother. | 5  someone personally does and what their employees do? |
| 6  Q. What is your highest level of education? | 6  A. Right. That's their responsibility. |
| 7  A. Eleventh grade. | 7  Everybody not responsible for somebody's actions. |
| 8  Q. Where did you attend the 11th grade? | 8  Q. Okay. Are you aware that in an institution, |
| 9  A. William Penn. | 9  such as a prison, correctional officers must have the |
| 10  Q. Where is that? | 10  ability to take actions and make decisions without |
| 11  A. Basin Road, New Castle. | 11  consulting the warden? |
| 12  Q. Okay. What was the last full-time job you had | 12  A. Yes. I understand that. |
| 13  prior to your incarceration? | 13  Q. What do you believe Warden Williams' job is? |
| 14  A. VFL Technology, heavy equipment operator. | 14  A. He's the overseer of everything. And |
| 15  Q. What was your responsibility at VFL? | 15  especially, like I said before, an incident as somebody |
| 16  A. Running the processing plant. | 16  calling -- being in an institution, certain crimes is not |
| 17  Q. What was your rate of pay at that job? | 17  tolerated, like molesting a child. You know, certain |
| 18  A. Ten-something an hour. | 18  crimes is not tolerated and put you at risk. And like my |
| 19  Q. Okay. | 19  situation, being called a child molester put me at risk. |
| 20  A. Underpaid. | 20  Q. So you believe that Warden Williams should |
| 21  Q. Okay. Are you currently married? | 21  have been aware of that? |
| 22  A. No. Uh-uh. | 22  A. I'm at risk of getting stabbed, beat down. |
| 23  Q. Do you have any children? | 23  And in my case, when I contact everybody, you know, let |
| 24  A. Nope. | 24  her know -- because I'm on the mental health tier. So |

William Frederick Davis, III

4 (Pages 10 to 13)

## Page 10

1  some days I'm not responsible for -- I can't do on my
2  own. So they're supposed to help me go the extra mile to
3  help me out. And that wasn't being done.
4      Q. Now, how do you know Warden Williams was aware
5  that you were being called a child molester?
6      A. Say --
7      Q. How do you know that Warden Williams knew that
8  you were being called a child molester?
9      A. He should have been known.
10     Q. How should he have known?
11     A. Because whoever is charge of mental health.
12     Q. So --
13     A. Whoever Ms. -- at that time was Dr. Boston is
14  in charge of mental health. And she's the director, or
15  something like that, of mental health. And if she's
16  notified -- because that's a serious thing. Sometimes if
17  the person being called a child molester -- they put
18  certain people in protected custody so stuff don't
19  happen. But in that case they waived it off, waived it
20  off, waived it off like it was no big deal.
21     Q. Is it possible that Warden Williams was never
22  told that you were being called a child molester?
23     A. I don't know that. I have nothing to do with
24  that. I just know it was supposed to happen. That's all

## Page 11

1  I know.
2      Q. Okay. So you believe it was his
3  responsibility to protect you?
4      A. Right.
5      Q. Have you ever had a conversation with Warden
6  Williams?
7      A. No.
8      Q. Okay. Let's talk a bit more about your
9  complaint. As I understand your complaint, it's based on
10  a fight that allegedly occurred between you and an inmate
11  named Brian Casey.
12     A. Right.
13     Q. Could you please tell me exactly what
14  happened?
15     A. Well, it started with people calling me "child
16  molester" over and over and over and over and over. And
17  me taking medication at the time for depression, being
18  under -- not under but -- under the care of my counselor,
19  Debra, Ms. Debra -- and she was aware of the allegations.
20  Mayes was aware of the allegations. C/O Reynolds is
21  aware of the allegations. These officers are always on
22  duty full-time. And I went to them several times about
23  what's going on. He called me a "child molester."
24     Q. When you say "he," are you referring to --

## Page 12

1      A. Brian Casey.
2          And I'm in here for burglary.
3      Q. So when did the fight take place?
4      A. Breakfast.
5      Q. Breakfast on what day?
6      A. May 31st. I'm not a hundred percent sure.
7      Q. Of what year?
8      A. I think 2004.
9      Q. Tell me exactly what happened. You arrived
10  for breakfast.
11     A. Well, back up to more -- like two weeks before
12  that I was in the yard playing basketball. And two
13  different occasions Ms. Davies -- I forgot her first
14  name -- and Mayes seeing him push me, mush -- push me in
15  the face. And they did not take action.
16         And I'm like saying, on the mental
17  health tier, this is not supposed to be tolerated;
18  because they got a level system that if people act out
19  they're supposed to follow the level system to discipline
20  so it won't reoccur or happen at all. But that is not
21  happening. They're not using the level system. And
22  that -- and 1D Tier is not being ran properly and
23  putting -- and had put me at risk.
24         But them two different occasions he

## Page 13

1  pushed me in the face. And I'm a humble guy, because I'm
2  working on being a Christian. I didn't retaliate,
3  because that's just not me. It's not my personality to
4  fight.
5          And then two weeks after that, we in the
6  lunch line. He trying to get in front of me. And he
7  called me a "child molester." And I told him again I'm
8  not here for child molester. And he pushed me in the
9  face twice. And I don't want to fight. And he keep
10  harassing me. So I'm in line trying to get my food --
11  seconds. And when I turned my back like seconds later,
12  that's when he hit me in my jaw and shattered it.
13     Q. What happened after the fight?
14     A. I ran him down and -- I was like in shock
15  because my jaw was shattered. And I probably hit him.
16  And they showed me some pictures. I was like I didn't do
17  that, because, you know -- but my jaw was like -- it was
18  broke on both side.
19         And they took me to the medical. And
20  the medical that was in charge at the time was
21  Correctional Medical Service, I think, or First
22  Correctional Medical. One of them. I can't remember
23  right now. But I told Officer Fred Way -- I told him my
24  jaw was broke. And they -- they don't really care.

Page 14

1  Like -- and they just packed some gauze in my mouth. And
2  I repeated over and over my jaw is broke. They like put
3  gauze in and sent me back on the tier. So I looked in
4  the mirror -- I knew it was broke. I looked in the
5  mirror. And it was crooked. I'm like, how they not see
6  that? So I had been complaining for four or five days my
7  jaw was broke. I didn't eat, drink no fluids, no
8  nothing. And that was really some serious pain.
9        And then I went to the guard, Mayes,
10 Officer Mayes. He's a senior officer. All these --
11 between the four -- the five, six days complaining. And
12 nothing was done.
13       Then Ms. Debra -- I went to her. And I
14 told her this wouldn't have happened if you took, you
15 know, the proper steps of doing something about this,
16 because I went to you tons of times about what's going
17 on. Now look at me. My jaw is broke. Now I got numb --
18 this is numb. I got screws and stuff all in my jaw. For
19 what?
20       Q. Okay. Let's go back through what you talked
21 about in more detail. Let's first talk about the
22 incidents while you were playing basketball.
23       A. Right.
24       Q. Tell me about the first incident.

Page 15

1        How many inmates were out in the yard
2  while you were playing basketball?
3        A. Roughly, 15.
4        Q. How many officers were out there?
5        A. One.
6        Q. Who was the officer?
7        A. One occasion was Officer Mayes, and the second
8  one -- occasion was Officer Davies.
9        Q. So on the first occasion it was Officer Mayes?
10       A. Yes.
11       Q. Okay. Were you playing basketball?
12       A. Yes.
13       Q. Was Mr. Casey playing basketball?
14       A. Yes.
15       Q. So how did it happen that he pushed you in the
16 face?
17       A. That he -- he mushed me. Well, pushed,
18 mushed. Right. Because basketball is a competitive
19 sport -- and a lot of people -- if somebody is dominating
20 the game and other people instigating things, the other
21 party don't like it. And me being an aggressive player
22 and having fun -- I like having fun. And some people
23 don't like it. And they do all their power to try to
24 stop you from scoring.

Page 16

1        And in that situation, you know, I'm
2  having fun, laughing, you know, doing what I want to do
3  because of my size. He didn't like it. And he pushed me
4  in the face like that. I'm like, "Yo." I said I don't
5  want to fight you, dah-dah-dah-dah. But I think between
6  that and the child molesting came together, because
7  people call me -- he called me a "child molester." So
8  he's already got something against me, period. From the
9  start he's got something against me.
10       So between that -- me playing
11 basketball -- he didn't like what I was doing --
12 escalated it for him to push me in the face trying to
13 start a fight. But like I said, my personality and the
14 way I am, I don't fight. I don't like fighting. That's
15 just me.
16       Q. So he pushed you while you were playing the
17 game?
18       A. Well, we had stopped playing. Well, yeah,
19 while we was playing. And this came up. Yeah. Somebody
20 took the ball out, and he came up and like mushed me in
21 the face then. And he did it two times. You know, the
22 first time with Mayes and the second time with Davies.
23 He did it twice. That was my -- I'm like, he did it
24 twice and they -- you know, I've been complaining. I've

Page 17

1  been complaining the whole thing. And it's just...
2        Q. You said there were 15 inmates out there?
3        A. Roughly. I don't know. I didn't count -- I
4  don't how many people are out in the yard.
5        Q. So, now, what makes you think that Officer
6  Mayes saw the push?
7        A. Because that's his job to observe anything
8  out there. Oh, he seen it, because the way I play -- and
9  he's always rooting for me, because me and him got a
10 relationship, because at one point in time I was tier man
11 and stuff like that. So we do have a relationship. It
12 ain't like I'm some total stranger. We have a
13 relationship. And we always talking. And he's always
14 rooting for me playing basketball.
15       Q. So do you know definite that he saw?
16       A. Yes.
17       Q. Did he do anything to break it up?
18       A. Well, it was just a mush. So I guess they --
19 a lot of people take that as not that serious, I guess.
20       Q. So what would you have wanted Officer Mayes to
21 do?
22       A. They got a level system they supposed to
23 follow. When an inmate is -- because you got a lot of
24 inmates taking serious medication. They got some real

William Frederick Davis, III

6 (Pages 18 to 21)

Page 18

1  serious behavior problems. And Brian Casey is one of
2  them -- he's one of them categories. He's real
3  hostile. He cusses the guards out -- inmates,
4  everything. They moved him off the tier because of his
5  behavior and brung him back on the tier.
6      Q. But specify for me what Officer Mayes should
7  have done in this incident.
8      A. Reported it. He didn't report it. And they
9  didn't use the level system. So he's out ready to
10 reoffend again. And he -- and that's what he did.
11     Q. Okay. Now, the second incident was also on
12 the basketball court?
13     A. Yes.
14     Q. Tell me how many inmates do you remember were
15 out then.
16     A. Probably the same. You know, I don't know.
17 It's not my job to count them. That wouldn't even make
18 sense.
19     Q. But you weren't the only inmate out there?
20     A. No.
21     Q. Okay. Was it more than five?
22     A. Yeah. There was more than five.
23     Q. More than ten?
24     A. Yeah. I mean, just ten. Like I say, it's not

Page 19

1  crowded. There's not a lot of people out there.
2      Q. How many officers were out there?
3      A. One.
4      Q. Who was that officer?
5      A. Davies.
6      Q. What happened in this instance?
7      A. Same thing.
8      Q. So you were playing basketball?
9      A. Yep. And he did it again.
10     Q. And Casey didn't like how you were playing?
11     A. Yep. And mushed me in the face again.
12     Q. Because of the basketball game?
13     A. Well, between that and calling -- he been
14 calling me a "child molester." Same. It just came to a
15 head. And he wanted to fight me, but I don't want to
16 fight.
17     Q. Did he call you a "child molester" while you
18 were playing basketball?
19     A. No, no.
20     Q. He called you that when?
21     A. Every day while we on the tier.
22     Q. Okay.
23     A. Not just him but a lot of people call me that.
24 So he was like one of the ringleaders.

Page 20

1      Q. Did Officer Davies see him push you?
2      A. Yes.
3      Q. How do you know she saw him push you?
4      A. Same thing. You know, the way I play, I bring
5  a lot of tension, because -- I ain't saying I'm great.
6  And I just bring entertainment to the yard. And that's
7  one of the biggest thing -- coming outside to watch
8  people play basketball. That's the reason why most of us
9  come out there -- is to play -- watch the people play
10 basketball or we play basketball, because there ain't
11 much to do in jail. So that's one of the biggest
12 activities in jail is basketball.
13         And I talk to her at -- I talk to her
14 not that much. I got more of a close relationship with
15 Mayes than her. I just see her like going to chapel and
16 stuff like that. And plus, she's a woman. And you don't
17 have much contact, you know, in jail with a woman. So if
18 you see a woman, it's like you get special attention.
19     Q. After the push what did Officer Davies do?
20     A. Nothing.
21     Q. Did you tell her that he had pushed you?
22     A. She seen it. I wouldn't have to tell her.
23 Plus, I did mention it to her. I did both.
24     Q. What did you say to her?

Page 21

1      A. I told her what he did. And my argument was,
2  when he did it back -- it happened twice. I was like,
3  well, it happened again. How much do I have to put up
4  with? See what I'm saying. Him pushing me and getting
5  away with it. And the same thing. Nothing happened.
6  Like I said, the level system wasn't used. The counselor
7  knew about it. Nothing to do -- there wasn't nothing
8  done.
9      Q. Now, tell me about this level system.
10     A. Well, they got a level system as -- like if
11 somebody just act out or -- instead of sending them to
12 the hole, if it's not that bad, they put them in the cell
13 for X amount of days and flow them out -- take away
14 restrictions, no phone call, no yard time, you know, no
15 commissary, eat in your cell, and stuff like that.
16         And what they supposed to, I'm
17 guessing -- is go to the psychiatrist. If it's the
18 medication making them act the way they act -- whatever
19 it is, I don't know. But most times that I've been
20 there -- and I've seen a lot of fights. They do not use
21 that level system. And that was one of my biggest
22 arguments about that level system. And they letting a
23 lot of stuff go. They don't correct them people.
24         And he was an at-risk inmate, anyway.

Page 22

1  He got left off the -- they moved him off the tier
2  because of his behavior, cussing out the counselors and
3  guards. And he's a real violent man. My argument: Why
4  would you bring him back? And you brung him back. And
5  I've got the bad end of the deal.
6      Q.  With the fight with Inmate Casey the second
7  time where Officer Davies was present, did you file a
8  grievance?
9      A.  It wasn't a fight.
10      Q.  Oh, the push.
11      A.  The push.
12      Q.  I'm sorry.
13      A.  Right.
14      Q.  Did you file a grievance?
15      A.  No. The only grievance I filed is -- I filed
16  a grievance, but it wasn't like particular to that. It
17  was the officers -- their conduct. And that's what I
18  filed a grievance on -- their conduct.
19      Q.  When did you file this grievance?
20      A.  I don't know the specific day.
21      Q.  But you did file a grievance --
22      A.  And they said I can't -- you know, you can
23  file a grievance. Then they ask what you want done --
24  the actions you want done. And I guess, what I asked

Page 23

1  for, they said you can't do it. So I was all right with
2  it. At least I did file the grievance, you know. And I
3  guess if you're not satisfied with the finding of their
4  answer, then my knowledge that I -- somebody told me,
5  because I don't know too much about it, you take it to
6  the next level. But I was satisfied with the answer they
7  gave me.
8      Q.  So you were satisfied with the results of the
9  grievance?
10      A.  Right. They said I couldn't grieve an officer
11  and ask for -- what's the word I'm going to use? Like
12  some kind of action towards them. I can't do that.
13      Q.  Going back, did you file a grievance after the
14  incident where Officer Mayes was present?
15      A.  Well, I put the whole thing -- grieved about
16  both situations, about the push, and they didn't do
17  nothing about it. And that was the whole -- you know,
18  both incidents was based -- the whole thing was on that,
19  that I can remember.
20      Q.  So you put everything into one grievance?
21      A.  Right.
22      Q.  Do you have a copy of that grievance?
23      A.  Not with me.
24      Q.  You have it back in your cell?

Page 24

1      A.  Right.
2      Q.  Could you send me a copy of that grievance?
3      A.  If I can find it.
4      Q.  Okay. Let's talk about breakfast, the
5  breakfast where you said inmate Casey hit you in the jaw.
6  What time did you arrive at breakfast?
7      A.  They serve at like nine o'clock in the
8  morning.
9      Q.  Was Casey already there when you arrived?
10      A.  They let us all out at the same time.
11      Q.  So you --
12      A.  So sometimes they -- I don't know -- well,
13  somebody told me they supposed to do it a little at a
14  time. Like do five, five, five, five. So it don't be
15  all congested. But when you let -- because you let the
16  guys -- that's a medical tier. If you let them all out
17  at once, it's called confusion. That's what a lot of
18  times happens. Plus the officers don't monitor the food
19  cart when being -- people being served. There's a lot of
20  butting in line. There's just a lot of confusion. And
21  that happens a lot too.
22          And that's how it is -- I think it
23  might -- I'm not, you know, trying to make stuff up. But
24  when -- sometimes the officers will come on the tier to

Page 25

1  monitor the food cart, because, like I said, you have to
2  look at it through the people or -- mentally, some of
3  them was more worse than others. So really everybody is
4  at risk. Everybody is at risk. And it's just --
5  something needs to change. I'm quite sure it's still
6  going on, because it's been going on since I've been
7  there two years. And I've seen tons of fights -- tons of
8  them. And a lot of them are being covered up. And it
9  shouldn't happen.
10      Q.  You and Casey were both on the same tier?
11      A.  Yes.
12      Q.  What tier was that?
13      A.  1D.
14      Q.  You said that's the mental health tier?
15      A.  Yes.
16      Q.  So you and Casey arrived at breakfast around
17  the same time?
18      A.  They let us all out at once.
19      Q.  And you were in line?
20      A.  Right.
21      Q.  Were you next to each other?
22      A.  Well, eventually, we got to -- we weren't out
23  that -- at first we wasn't. But he's trying to butt in
24  front of me. And he's calling me "child molester" and

William Frederick Davis, III

8 (Pages 26 to 29)

Page 26

1  dah-dah-dah-dah-dah and all that. And I keep saying the
2  same thing: "Why you keep harassing me? Why you
3  keep" -- over and over and over and over and over. And
4  he's talking about he's going to do this to me. He's
5  going to do this. And I said, man, I cut you a break
6  last time, because you have two incidents that happened
7  in the court -- I mean, on the basketball court. You
8  know, I'm getting tired of you keep harassing me. So
9  when I went back in line for the seconds, that's when I
10  guess he had his opportunity to get me -- when my back
11  was turned. And that's what happened.
12     Q.  Just so I'm clear: You both were in line?
13     A.  Right.
14     Q.  And --
15     A.  Well, I was in front of him. He's trying to
16  move up -- and try to move up in front of me. I'm asking
17  him, yo, why you keep doing what you doing? Why you keep
18  harassing me? Why you keep provoking me? Why you
19  keep -- it was just a whole bunch of crap. And I just
20  got, you know -- I just told him: Why?
21     Q.  So you were arguing with each other?
22     A.  Right. Well, I wouldn't say arguing. I just
23  telling him: Why you keep calling me a "child molester"?
24     Q.  Then you both got your food?

Page 27

1     A.  No. I didn't get the chance to get the
2  seconds. I got the first. This was in the seconds line.
3     Q.  So he didn't start arguing with you until you
4  were in the seconds line?
5     A.  Right.
6     Q.  Okay. What happened after you were arguing?
7     A.  What you mean by "what happened"?
8     Q.  Who hit who first?
9     A.  He hit me. My back was turned. When I turned
10  back to try to get, you know -- get ready to get my food
11  for the second time, I turned my back. So he was behind
12  me. I lost focus really where he was at. And then like
13  seconds later, that's when he hit me.
14     Q.  If your back was turned to him, how did he hit
15  you in the jaw?
16     A.  Well, that's easy. A side thrust. That ain't
17  hard.
18     Q.  After he hit you, did you hit him back?
19     A.  Yes.
20     Q.  Do you know if Mr. Casey was injured during
21  the fight?
22     A.  Well, it all depend what you mean by
23  "injured."
24     Q.  Was he hit?

Page 28

1     A.  His jaw should have been like mine. But, no,
2  his jaw -- he wasn't -- he didn't require no medical
3  attention.
4     Q.  Was he hit?
5     A.  Yeah, he was hit.
6     Q.  So there was a fight between you both?
7     A.  Right. I know I couldn't let him hit it
8  again. That's why I had to protect my jaw.
9     Q.  Were there any officers present in the chow
10  hall at this time?
11     A.  Not on it. Not on the tier. Just in the
12  module.
13     Q.  Did any officers step in once the fight
14  started?
15     A.  No.
16     Q.  How long before officers came and stepped in?
17     A.  Three minutes. I don't even know. Three
18  minutes, five minutes. I'm guessing.
19     Q.  By then your jaw was already broken?
20     A.  Oh, definitely. It broke when he first hit
21  it. I know it was broke when he first hit it.
22     Q.  Did anyone take you to the infirmary?
23     A.  Fred Way. Sergeant Fred Way.
24     Q.  What happened in the infirmary?

Page 29

1     A.  Practically nothing.
2     Q.  Who --
3     A.  They put a -- Nurse Jeremy examined me. And I
4  told Fred Way my jaw was broke, Sergeant Fred Way. I
5  told Jeremy my jaw was broke. And he just looked at it.
6  I wrote a quick look. Like real quick. And stuck gauze
7  in my mouth. And five, ten minutes later I was back on
8  the tier.
9     Q.  Did he examine you after that?
10     A.  You mean a second time?
11     Q.  Yes.
12     A.  No.
13     Q.  Did he examine you a second time?
14     A.  No.
15     Q.  Did you file a sick call slip?
16     A.  I think I did. I'm not a hundred percent
17  sure.
18     Q.  Do you have a copy of the sick call slip?
19     A.  I don't even know -- I can't remember if I did
20  that or not. I'm not really sure.
21     Q.  Who did you --
22     A.  I went to Mayes, Officer Mayes. He knew about
23  it. Officer Reynolds, he's the -- both of them officers
24  are senior officers always on duty. And my counselor.

William Frederick Davis, III

9 (Pages 30 to 33)

Page 30

1  And she finally got through to them to take me to the
2  infirmary after like five or six days.
3      Q.  So what did Officer Mayes do in response to
4  you telling him that your jaw was broken?
5      A.  Nothing got done.  They didn't -- I can't walk
6  down to medical.
7      Q.  Did he tell you to file a sick call slip?
8      A.  I can't remember what he said exactly.
9  Because I couldn't eat.  I hadn't eaten the whole five,
10  six days.  I didn't have no food, so...
11      Q.  What happened after five or six days?
12      A.  Ms. Debra finally got through to medical, and
13  I went on down there and stood down there for another
14  five days.  So all together it was like 11 days.  And
15  then I went to the outside hospital.
16      Q.  So you didn't go to an outside hospital until
17  approximately 11 days --
18      A.  Eleven days.
19      Q.  -- after you were hit?
20      A.  Yeah.
21      Q.  What hospital did you go to?
22      A.  I've been -- because I had my hernia -- and I
23  went to two different hospitals.  X-ray went to
24  St. Francis.  X-rays -- and I went to Christiana Hospital

Page 31

1  x-ray.  I was just going -- there was a lot of stuff
2  going on back then.  I think it was Christiana.
3      Q.  But you had been in both Christiana and
4  St. Francis?
5      A.  Right.  Because I had x-rays done at both
6  hospitals.
7      Q.  When did you have your surgery?
8      A.  I can't remember the exact day.  I can't
9  remember the exact day.  I know like 11 days in between
10  the incident, July 31st, and August whatever --
11  August 10th, 11th.
12      Q.  Okay.  Now what I want to do is show you some
13  different exhibits related to the case.  I think some you
14  filed with the court and then some I also have.
15      A.  Right.
16      Q.  Anything I show you the court reporter is
17  going to attach to the deposition transcript.
18      A.  Right.
19      Q.  So you'll be able to see it and have a copy of
20  it.
21      A.  Right.
22      Q.  Okay.  So let's go through a few of the
23  exhibits.  The first one the court reporter is going to
24  mark for me as Davis Exhibit No. 1.

Page 32

1      A.  Right.
2      Q.  And then he's going to pass it to you.  When
3  you receive it, just take a moment to review it.  And
4  when you're done reviewing it, just let me know.
5          (Davis Deposition Exhibit No. 1 was
6  marked for identification.)
7  BY MS. TROSS:
8      Q.  Did you want to flip through it?
9      A.  No.
10      Q.  Okay.  Do you recognize this exhibit?
11      A.  Yes.
12      Q.  What is it?
13      A.  Motion to amend.
14      Q.  Did you draft the motion to amend?
15      A.  No.
16      Q.  Who drafted it?
17      A.  Somebody else did.  An inmate drafted it.
18      Q.  Do you know the inmate's name?
19      A.  No.
20      Q.  How did the inmate know what to draft?
21      A.  I don't know.  I guess he knows.
22      Q.  Did you tell him about what happened?
23      A.  Well, I tell him -- yeah.  I gave him that
24  information.

Page 33

1      Q.  Did you read it before you filed it?
2      A.  I think.  I guess I did.  I can't remember.
3      Q.  Is it possible that something in here is not
4  accurate?
5      A.  No.
6      Q.  Let's go through the motion to amend.  Okay?
7  I have a couple of questions about what's in here.
8      A.  What you reading?
9      Q.  I'm reading page 3.
10      A.  Oh.
11      Q.  Let's start from the beginning.
12          You say:  In regards to the
13  above-captioned civil action where Inmate Brian Casey
14  broke my jaw on May 31st, 2004.  So you're saying
15  May 31st, 2004 was the day?
16      A.  Was it June?  Yeah.  I wasn't really sure.
17      Q.  It was May 31st?
18      A.  Right.  I wasn't really sure.
19      Q.  You say:  Subsequently, Inmate Brian Casey was
20  sent to the hole for his actions.  How do you know that
21  occurred?
22      A.  Captain Emmit told me.
23      Q.  Do you know Captain Emmit's first name?
24      A.  No.  He's in internal affairs.

William Frederick Davis, III

10 (Pages 34 to 37)

Page 34

1    Q.  You said Officer McReynolds witnessed the
2  incident.
3    A.  Right.
4    Q.  Was Officer McReynolds present in the
5  cafeteria?
6    A.  He was in a module.  They call it the
7  bubble -- a module -- inside.  Sometimes some guards come
8  out and sometimes they don't.
9    Q.  When he witnessed the incident, what did he
10  do?
11    A.  What they supposed to do -- they call for a
12  backup, call a Code 8.  And they call for backup.
13    Q.  What is a Code 8?
14    A.  A fight.
15    Q.  Do you know if he called the Code 8?
16    A.  Well, they came.
17    Q.  You said Captain Emmit investigated the
18  incident and forwarded the information to the attorney
19  general's office.  Did you ask Captain Emmit to
20  investigate the incident?
21    A.  Right.  Because I wanted to press charges.
22    Q.  Do you believe that he investigated it?
23    A.  No.  He didn't.
24    Q.  Did he tell you that he investigated?

Page 35

1    A.  Yes.
2    Q.  Did --
3    A.  Several times.  And he started avoiding me.
4    Q.  What did he tell you were the results of the
5  investigation?
6    A.  He said attorney general office is not going
7  to prosecute.
8    Q.  So --
9    A.  But I found out that was a lie.
10    Q.  What was a lie?
11    A.  Because he never went up there.  Because my
12  mom called up there.
13    Q.  Do you remember who your mom spoke with?
14    A.  Not exactly, no.
15      Because I talked to Captain Emmit and he
16  said -- I said, well, who did you talk to?
17      And he said some woman or some man.
18  Something like that.
19      I said, well, who the person name?
20      He said he didn't know.
21      I said, You don't know?  You Internal
22  Affairs.  How you not going to know that name?  Which I
23  think who was up there at that time was Jane Brady.  And
24  that's what he told me.  That really was a lie, but

Page 36

1  that's what he told me.  He never contacted that office.
2    Q.  So what was it that you wanted Captain Emmit
3  to do?
4    A.  I wanted to press charges.
5    Q.  Do you believe that Captain Emmit had the
6  authority to press charges?
7    A.  No.  To forward the information.  He didn't
8  forward the information.
9    Q.  So --
10    A.  He didn't even investigate it.  He didn't do
11  anything.
12    Q.  So you wanted him to do an investigation?
13    A.  Right.
14    Q.  And to --
15    A.  Forward the information to the attorney
16  general's office.  He didn't do that.
17    Q.  And the reason you think that is because of
18  what your mom said when she called?
19    A.  She called up there, and they didn't know what
20  she was talking about.  They said nobody gave -- they
21  gave them no information about the incident.  They didn't
22  know nothing about no Captain Emmit.  They didn't know
23  anything.  So I went back to Captain Emmit.  I said,
24  "Well, who did you talk to?"  And that's where the

Page 37

1  confusion came in at.  He just lied.  That's all it is.
2  He lied.
3    Q.  Well, if you found out that he did do an
4  investigation and spoke with someone --
5    A.  He didn't.
6    Q.  Let's say hypothetical.
7    A.  No.  You can't say that.  He didn't.
8    Q.  Okay.  So you're saying he didn't.
9    A.  He didn't.  He just totally lied.
10    Q.  Okay.  All right.  Let's continue on with the
11  amended complaint.  We talked about your mother already
12  calling.
13    A.  Right.
14    Q.  And you said that you don't remember who she
15  spoke with.
16    A.  No.
17    Q.  But whoever she spoke with told her --
18    A.  She didn't know what she was talking about.
19  She didn't -- they didn't know nothing about no Captain
20  Emmit calling up there giving them any information about
21  that incident.
22    Q.  Okay.  Let's continue on in the amended
23  complaint.  Give me one second.  Okay?
24      Okay.  Let's go to the fourth page of

Page 38

1  the amended complaint.  No.  You were right the first
2  time.  You're right.  It's numbered page 1, but it's the
3  fourth page in the document.
4       A.  Oh.
5       Q.  Okay.  The second paragraph on the page says:
6  The following statement is about an incident that
7  occurred in 1D pod through May 16, 2004 and continued
8  beyond May 31st, 2004.  May 16, 2004, you said that was
9  the first incident that occurred in the yard?
10      A.  Right.
11      Q.  That was when you were playing basketball?
12      A.  Right.
13      Q.  Now, here you have Officer Davies was in the
14  yard.
15      A.  Right.
16      Q.  So it was Officer Davies?
17      A.  Right.
18      Q.  Because when we were discussing earlier you
19  said Officer Mayes.
20      A.  Both.
21      Q.  They were both in the yard?
22      A.  No.  Two different occasion.
23      Q.  But the first time who was in the yard?
24      A.  It was Mayes.

Page 39

1       Q.  So here you have Davies.
2       A.  Well, I might have -- I don't know.
3       Q.  Is it possible whoever wrote it for you got it
4  wrong?
5       A.  Probably so.
6       Q.  Okay.  So that's wrong.
7       A.  Probably --
8       Q.  It should be Mayes?
9       A.  Probably vice versa.  Right.
10      Q.  Okay.
11      A.  I'm quite sure Mayes was first.
12      Q.  It says you requested action against Inmate
13  Casey.
14      A.  Right.
15      Q.  What exactly did you say to Mayes that you
16  wanted action?  What did you tell him?
17      A.  He's supposed to be disciplined with the level
18  system -- whatever their punishment is for somebody that
19  put their hands on another inmate.  They got -- they
20  can, I mean, send them to the hole, give them a 24, use
21  the level system.  Whatever they're supposed to do, they
22  ain't -- nothing happened.  As I said before, just
23  nothing happened.
24      Q.  Okay.  Then on page No. 2, the second

Page 40

1  paragraph, you say:  Later that week Inmate Brian Casey
2  again pushed me in the face while playing basketball in
3  front of Officer Mayes.
4       A.  Right.
5       Q.  Should that be Officer Davies?
6       A.  Right.  Vice versa.
7       Q.  And that happened after May 16th?
8       A.  Right.
9       Q.  What did you ask Officer Davies to do?
10      A.  Same thing.
11      Q.  Which is?
12      A.  Something.  Because I couldn't believe, you
13  know, he did it again.  That was that -- that really was
14  a shocker to me he did it two times.
15      Q.  Let's go to the third paragraph.
16          You said:  Two weeks later on May 31st,
17  2000, Inmate Casey called me a "child molester" during
18  breakfast.  We stood face-to-face during his accusation.
19      A.  Right.
20      Q.  So you guys were arguing during breakfast?
21      A.  No.
22      Q.  What happened?
23      A.  You just asked me that --
24      Q.  Right.

Page 41

1       A.  -- again.
2       Q.  I just --
3       A.  You're repeating the same thing.
4       Q.  Well, now that I know that someone else wrote
5  this, I'm just trying to clarify what in here is right
6  and what's not right.
7       A.  Right.
8       Q.  So --
9       A.  A lot of -- I mean, he was calling me a "child
10  molester."
11      Q.  Okay.
12      A.  And I was telling him the same thing.
13      Q.  Okay.
14      A.  And then I told him, you know, about the push
15  in the face, the whole thing.  I said, "You been
16  harassing me."  And it's just over and over and over
17  again, same thing.
18      Q.  So you stood face-to-face?
19      A.  Right.
20      Q.  So would you consider this a fight that took
21  place?
22      A.  What you mean?  Yeah.  It was a fight, yeah.
23      Q.  On the next page, page No. 3, you say at the
24  top:  I repeatedly told the nurse, Jeremy, and others --

William Frederick Davis, III

12 (Pages 42 to 45)

Page 42

1  Fred Way -- that my jaw was broken and was ignored. In
2  addition to Fred Way, who else did you tell in terms of
3  correctional officers?
4      A.  Fred Way and the nurse. Mayes knew too.
5  Well, really all of them knew. Mayes -- because they're
6  the senior officers. Mayes, Reynolds, Counselor Debra --
7  all of them knew. I mean, Mayes and Reynolds are the
8  senior officers. They're there all the time. Everybody
9  knew about my jaw.
10     Q.  Okay. At the bottom of page 3, you say:
11  After five days, my pod counselor, Ms. Debra --
12     A.  Right.
13     Q.  -- called the infirmary. I was admitted but
14  lay there another six days with a broken jaw before being
15  seen by a surgeon.
16         Is that statement correct?
17     A.  Right.
18     Q.  In the next paragraph, you said: Brian Casey
19  was on 1D pod prior to my complaint. At that time mental
20  health procedures were followed. So you're saying at
21  that time they did follow what they were supposed to?
22     A.  Right.
23     Q.  Who was it that followed the mental health
24  procedures?

Page 43

1      A.  I think Ms. Debra did.
2      Q.  Anyone else?
3      A.  Well, she -- I think she sets it up and passes
4  it on to the officers. He just sets it up.
5      Q.  You then say Inmate Casey was removed from the
6  pod for displaying inappropriate behavior.
7      A.  Right.
8      Q.  Officers removed him from the pod?
9      A.  I don't think they can do it. I think the
10  counselor, Ms. Debra, did it. The only way they can move
11  him -- if he do something like what he did -- fight
12  somebody -- that be like instantly they move him off the
13  tier. But if he's displaying some kind of behaviors,
14  that's a different process, I guess.
15     Q.  Okay. Now, let's go through what you say each
16  of the people did. You said Warden Raphael Williams
17  ignored the attacks. Is that correct?
18     A.  Right.
19     Q.  Did not allow me to file charges. Is that
20  correct?
21     A.  Right.
22     Q.  Did not question me. Correct?
23     A.  Right. I ain't even seen him.
24     Q.  Did not follow procedures when attack occurs

Page 44

1  or an assault. Is that correct?
2      A.  Right.
3      Q.  Did Warden Williams see the fight?
4      A.  No.
5      Q.  Do you know whether Warden Williams was told
6  about the fight?
7      A.  Well, my understanding: A warden should know
8  anything that's major as a jaw being broke. And if a
9  person needs surgery, it's got to go through him to get
10  it approved. So if that's the case -- I ain't heard
11  nothing from him. And all these complaints? You know,
12  this has been going on. This is nothing new of what's
13  going on on that specific tier, because it's a mental
14  health. And all these fights is going on.
15         My thing is: He's supposed to be like,
16  well, what's going on with all these fights on this tier?
17  Why this tier have more fights than all the other tiers
18  in the whole institution? And I'm quite sure it's still
19  going on, because it's been going on for two years since
20  I've been there.
21     Q.  You also say he will not respond to letters.
22  When did you send him letters?
23     A.  I don't know exactly when, but it was while
24  all this was going on.

Page 45

1      Q.  Do you have copies of the letters?
2      A.  Probably not.
3      Q.  If you find that you do have copies, could you
4  please send me a copy of the letter?
5      A.  I think the only letter that I sent him was
6  this initial -- this here. This caption right here.
7      Q.  So the complaint.
8      A.  This here. This right here. I think I sent
9  him this.
10     Q.  When you say "this," you're talking about the
11  third page --
12     A.  Right. The third page.
13     Q.  -- of your amended complaint?
14     A.  Right. The third page.
15     Q.  Do you remember when you sent this to him?
16     A.  No.
17     Q.  Did you send him any other letters?
18     A.  No.
19     Q.  Now, let's turn for a minute to page 5 of your
20  amended complaint. It says Summary. It says: Where I
21  was pushed in the face twice on 7/16/2004 and on
22  7/20/2004. Now, these dates are different from the dates
23  in the beginning.
24     A.  Right.

William Frederick Davis, III

13 (Pages 46 to 49)

Page 46

1    Q.   Which day is correct?
2    A.   Because I was D pod, I went through so much on
3    that tier.
4    Q.   Okay.
5    A.   And I couldn't keep track of days, weeks.
6    Because I went through a lot of stuff dealing with
7    inmates doing stuff to me, because there was a lot of
8    stuff going on on that tier.  And I spoke up the truth
9    and tried to stop a lot of it.  They was selling
10   medications.  They were taking advantage of people
11   commissary, because they were mentally ill.  And there
12   was a lot of stuff they was doing to me on that tier.
13   And I could just couldn't actually get, you know, the
14   dates of exactly what happened.
15   Q.   So which day did this incident with the jaw
16   happen?
17   A.   The proper date is -- that date that we was
18   talking about, where is that?
19   Q.   The May 31st?
20   A.   Yeah.  The May 31st.
21   Q.   So that's the date it occurred?
22   A.   Right.
23   Q.   So 7/16 and 7/20 is wrong?
24   A.   I think so.  Right.

Page 47

1    Q.   So whoever wrote the complaint for you, that's
2    in error?
3    A.   That -- the dates, right.
4    Q.   And who wrote the complaint for you?
5    A.   I don't know.  A lot of inmates just say they
6    can do law work.  I just -- they just help me out,
7    because I can't do law work.  I'm not a lawyer.
8    Q.   So why didn't you try to write the complaint
9    yourself?
10   A.   Because I can't write.
11   Q.   Okay.  So in addition to these two dates, is
12   there anything else in the complaint that's wrong?
13   A.   No.  Not by the -- what happened.  Just the
14   dates.
15   Q.   Okay.  In No. 3 on page 5, you say:  My jaw
16   was shattered severely on both sides by Inmate Casey.  I
17   was operated upon from under my chin, which has two
18   obvious scars now.  Eleven metal screws were used
19   attempting to mend the jaw.  My lower lip is still
20   swollen after the operation of August 11th.
21        August 11th is when the operation
22   occurred?
23   A.   Right.
24   Q.   You say:  I am constantly slobbering and

Page 48

1    numbness remains.  Is that accurate?
2    A.   Right.  Only thing that's different with that
3    is my lip swollen went down, but it's still numb.  All
4    this is numb.  This is numb still.
5    Q.   When you say "this," say for the record --
6    A.   My chin.
7    Q.   Okay.
8    A.   My chin.
9    Q.   On page 6 you say:  My mental health has
10   gotten worse as a result of the attack.  Can you explain
11   to me how your mental health has gotten worse?
12   A.   Because the fear of people know what happened,
13   saying I'm a child molester.  And now I'm aware about
14   that constantly.  That was going on still.  And I
15   can't, you know -- and it's still going on -- crazy
16   stuff.  The jail is just nothing but a corrupt place.
17   You know and everybody know what jail is all about.  It's
18   about cover-up.  And I just got assaulted again here by
19   an inmate that got life in prison.  And they did the same
20   thing.  I'm getting ready to put another lawsuit in.
21   It's the same thing over and over again.
22   Q.   Okay.  Continuing on page 6, paragraph No. 6,
23   you say:  Captain Emmit many times deliberately ignored
24   about my questions involving the incidents.  How many

Page 49

1    times did you talk to Captain Emmit?
2    A.   Many times.
3    Q.   Give me a figure.
4        Was it more than once?
5    A.   I'd say about six times.
6    Q.   Did you verbally speak with him?
7    A.   Verbally speak with him.  He started getting
8    mad at me.
9    Q.   Did you ever write him letters?
10   A.   I wrote everybody the same letter.  The one
11   that I showed you before.
12   Q.   Page 3 of your complaint?
13   A.   Right, right.
14   Q.   And you actually wrote page 3, or did somebody
15   else write page 3?
16   A.   Somebody else did.
17   Q.   Do you remember who else wrote page 3?
18   A.   They all wrote -- page 3 was by somebody else.
19   Q.   Do you know who that person is?
20   A.   No.
21   Q.   How did they know what to write?
22   A.   I told them.
23   Q.   But you don't remember who you told?
24   A.   I don't know the inmate name.  See, a lot

William Frederick Davis, III

14 (Pages 50 to 53)

**Page 50**

1 of -- one thing about jail, you don't ask certain
2 questions and try to find out who they -- name and all
3 that. They got slangs, false names. And I don't know
4 what -- somebody's name is Johnny. I ain't going to the
5 C/Os and say, "What is his name?" because they're not
6 going to tell you. They just don't do that in jail.
7   Q.  But you trusted whoever it was to write your
8 complaint?
9   A.  Right.  Because I told them exactly what
10 happened.
11   Q.  Okay.  On page 6, paragraph 7, you say:
12 Requested to press charges on Inmate Casey were ignored
13 also by prison officials.  Who were the prison officials
14 that ignored you wanting to press charges?
15   A.  Everybody.  I wrote a letter to Captain
16 Williams about the incident.  I wrote -- everybody got --
17 whoever got the letter.  Everybody got the letter -- the
18 prison officials.
19   Q.  Did you ever write the attorney general's
20 office?
21   A.  Yes.
22   Q.  Do you have a copy of that letter?
23   A.  Same thing here.  This same thing -- the
24 caption we were talking about before.

**Page 51**

1   Q.  Page 3 --
2   A.  Right.
3   Q.  -- of your complaint?
4   A.  Yes.
5   Q.  And it was only that page?
6   A.  Right.  Just this.
7   Q.  Just page 3?
8   A.  Right.  Just what happened.  Basic
9 information.
10   Q.  And you sent that to the attorney general's
11 office?
12   A.  Yes.
13   Q.  Did you receive a response to your letter?
14   A.  They said that the institution got to give
15 them information.
16   Q.  Do you have a copy of the letter that was sent
17 to you from the attorney general's office?
18   A.  No.  They didn't tell me -- as a matter of
19 fact, they did tell my mom that.  My mom called there,
20 and they didn't know what she was talking about.  And
21 they said, well, they have -- the institution got to send
22 them information.  That's why there was a conflict
23 about -- he was saying one thing, and the attorney
24 general was saying something else, because my mom kept

**Page 52**

1 calling like over and over.  I kept telling her:  What's
2 going on?  I mean, it was confusing to me.  You know,
3 who's lying here?  The attorney general's office is lying
4 or Captain Emmit is lying.  Somebody is lying.  I don't
5 know who it is.  It didn't make sense to me.  I'm going
6 back and forth, back and forth, back and forth, back and
7 forth.
8   Q.  Did you file a grievance regarding what was
9 happening?
10   A.  That incident, no.  I filed that particular --
11 about me filing charges.
12   Q.  On page 7, paragraph 8, you said rumors were
13 spread by Inmate Casey and others.  Who were the others?
14   A.  The inmates.
15   Q.  Do you remember the other inmates who were
16 spreading these rumors?
17   A.  No.
18   Q.  Do you know why they were spreading these
19 rumors?
20   A.  What you mean by "why"?  It's obvious why.  I
21 mean, like I said, I was -- the reason why, like I had
22 said before, it was going on, because I was stopping a
23 lot of stuff that was going on on that tier.  They were
24 taking advantage of other inmates, taking their

**Page 53**

1 commissary and stuff like that.  So what they were trying
2 to do is -- well, I had one incident they tried to get me
3 off the tier.  But a lot of officers didn't know it was
4 all a lie.  And they didn't work -- they tried over and
5 over and over and over again.  And I guess the child
6 molesting thing -- you know, that's a real bad thing to
7 have attached to you.  So they were just trying anything
8 necessary to hurt me.
9   Q.  Mr. Davis, I'm handing the court reporter
10 what's going to be marked for purposes of this deposition
11 as Davis Exhibit No. 2.  When you receive it, please take
12 a moment to review it.
13       (Davis Deposition Exhibit No. 2 was
14 marked for identification.)
15 BY MS. TROSS:
16   Q.  Take a moment to review it.
17   A.  It's just the lawsuit.
18   Q.  Do you recognize this document?
19   A.  Yes.
20   Q.  What is this document?
21   A.  What you mean what is it?
22   Q.  Do you recognize it?
23   A.  It's the lawsuit.
24   Q.  This is the original complaint?

Page 54

1    A. Right.
2    Q. Okay. Let's turn for a moment to page 3 and
3  start at paragraph 4. It says Statement of Claim.
4    A. Right.
5    Q. Who wrote the Statement of Claim section?
6    A. Like I said, I was moving around a lot. And
7  me being bounced around, different people -- that's why
8  you got different handwritings.
9    Q. Did you write it?
10    A. You said that again. That's the second time
11  you said that. Or the third time.
12    Q. I'm just trying to get clarification.
13    A. No, no.
14    Q. Okay.
15    A. Because you see the different handwriting.
16  You got that handwriting. You look at here -- another
17  handwriting. You look there. There's another
18  handwriting.
19    Q. So it was a different person on this one --
20    A. Correct.
21    Q. -- than on the motion to amend?
22    A. Right.
23    Q. Okay. I just want to go through just a short
24  portion of your Statement of Claim. You say under

Page 55

1  paragraph 4, Statement of Claim, an inmate pushed me in
2  the face with his hands two times, and the incidents
3  never were documented --
4    A. Right.
5    Q. -- nor the aggressor being disciplined.
6      On and/or about May 31st, 2002 and
7  June 11, 2002 --
8    A. Right.
9    Q. Now, this complaint says 2002. Is that
10  correct?
11    A. Like I say again, there was a lot of stuff
12  going on back then.
13    Q. So that's an error?
14    A. Probably -- I think probably 2004. I don't
15  think it was 2002, because there was a lot of stuff going
16  on on that tier.
17    Q. So 2002 is wrong?
18    A. I think it was 2002. I can't even -- there
19  was so much going on. The one I said was 2004, I think.
20    Q. Right.
21    A. Oh, man. Because that tier was like -- they
22  had me like really messed up.
23    Q. So you don't remember whether it was 2002 or
24  2004?

Page 56

1    A. Yeah. Hold on. Let me see something. I'll
2  try and find --
3    Q. Okay. Take a moment.
4    A. Let me see. 2004.
5    Q. So 2002 is wrong?
6    A. Right. Yeah.
7    Q. Is there anything else in your original
8  complaint that's wrong?
9    A. No. Just the date that it happened, because a
10  lot of stuff was going on back then.
11    Q. So those 2002 dates are wrong?
12    A. Right.
13    Q. Okay. On the next page, which, I think, is
14  page 4 of the original complaint, under Statement, it
15  says: The statement hereof is about an incident that
16  occurred in the yard of 1D pod on July 16th, 2004.
17    A. I know.
18    Q. That's wrong?
19    A. No. It's 2004.
20    Q. Okay.
21    A. It's 2004, yeah.
22    Q. Did you read through the original complaint
23  before it was filed?
24    A. Yes.

Page 57

1    Q. So, to your knowledge, is anything else in
2  here incorrect?
3    A. No. Just the date that it happened, because I
4  had -- plus I had another lawsuit in. And that happened
5  in 2002. And plus, like I said, that tier was just so
6  much high water. It just kept -- a lot of stuff they was
7  doing to me -- I been to the hole, because somebody
8  pushed me in the face again. And they sent me to the
9  hole. And it got investigated. They let me back out of
10  the hole because they know it wasn't my stuff. It was
11  just a lot of stuff going on in that tier which shouldn't
12  be happening.
13    Q. Mr. Davis, I am handing the court reporter
14  what is going to be marked for purposes of identification
15  as Davis Exhibit No. 3.
16    A. This is the grievance thing here. Right?
17    Q. Yes. That's attached to your --
18    A. Right.
19    Q. -- original complaint.
20    A. Right.
21      (Davis Deposition Exhibit No. 3 was
22  marked for identification.)
23      THE WITNESS: What is the purpose of all
24  this again? Why are we going through all this?

William Frederick Davis, III

16 (Pages 58 to 61)

Page 58

1          MS. TROSS: The purpose of the
2    deposition, as I stated earlier, is just to get
3    clarification about what happened; to get my questions
4    and your answers under oath so that we can have a
5    transcript to use later on.
6          THE WITNESS: Later on for what?
7          MS. TROSS: Later on in the court
8    proceedings. For instance, if you or I file a motion,
9    you can refer to the transcript. Later on for trial, if
10   this goes to trial, we have the transcript.
11         It'll be over soon, I promise.
12         THE WITNESS: No. You know, I ain't got
13   no rush to go back over there and hear any more
14   harassment. That's what they do over there. That's just
15   the way jail is.
16   BY MS. TROSS:
17   Q.   Davis Exhibit No. 3 is an incident report
18   filed by Officer McReynolds on May 31st, 2004.
19   A.   Okay. This I never seen.
20   Q.   Okay. Take a moment to read through it and
21   review it.
22   A.   Okay. Well, I guess the reason because -- let
23   me see. Because this is -- who this is for?
24   Q.   This is regarding the incident that occurred

Page 59

1    between you and Mr. Casey.
2    A.   This ain't a disciplinary action report?
3    Q.   No. This is the incident report.
4    A.   Oh. That's what it looks like. The incident
5    report. I'm used to seeing that. All right. Let me
6    see. Okay.
7    Q.   Okay. Let's go through the incident report,
8    because I want to know from you what on here is correct
9    and what isn't. It says: On the above date and time,
10   which is May 31st, 2004, I, Officer McReynolds was
11   conducting chow. Inmates Brian Casey and William Davis
12   were in the chow line and began arguing. Is that
13   correct?
14   A.   Right.
15   Q.   During the exchange of words, Inmate Casey
16   punched Inmate Davis in the facial area. Is that
17   correct?
18   A.   Right.
19   Q.   Inmate Casey continued to bring the fight to
20   Inmate Davis. Is that accurate?
21   A.   Where we at again? Read that again.
22   Q.   It says: Inmate Casey continued to bring the
23   fight to Inmate Davis.
24   A.   What you mean by that?

Page 60

1    Q.   I think he's saying that --
2    A.   You see what I'm saying?
3    Q.   -- Casey tried to fight you.
4    A.   Right.
5    Q.   Is that accurate?
6    A.   Right.
7    Q.   It said: Inmate Davis fought back in defense.
8    A.   Right.
9    Q.   So you were fighting back; correct?
10   A.   That's exactly like I told you. I wasn't
11   going to let him hit my jaw again, because it was broke.
12   Q.   Okay. A Code 8 was called. Is that accurate?
13   A.   Correct.
14   Q.   Sergeant Way, Lieutenant Singh and multiple
15   other staff members responded to the code. Do you
16   remember those officers coming to respond?
17   A.   I don't remember Singh.
18   Q.   Okay. But you remember Sergeant Way?
19   A.   Right.
20   Q.   Do you remember any other officers?
21   A.   No. There was a whole bunch of them.
22   Q.   The responding staff members went onto the pod
23   and secured both inmates with handcuffs. Is that
24   accurate?

Page 61

1    A.   Yes.
2    Q.   Both inmates were then separately escorted to
3    the infirmary to be treated by medical. Inmate Casey was
4    escorted from medical to 1E9. What is 1E?
5    A.   Disciplinary.
6    Q.   So Casey went to the disciplinary unit?
7    A.   Right.
8    Q.   Inmate Davis was escorted from medical to 1D.
9    Is that accurate?
10   A.   Right.
11   Q.   So you weren't disciplined for the incident?
12   A.   No.
13   Q.   Okay. So to your belief this report is
14   correct? What we just read is correct?
15   A.   Right.
16   Q.   Okay. Were you ever interviewed by an officer
17   named Cropper regarding this incident with Mr. Casey?
18   A.   Right.
19   Q.   An officer named Officer Cropper came to
20   you --
21   A.   Right.
22   Q.   -- and asked you questions?
23   A.   Yeah. He was supposed to be -- what's his
24   position? Some kind of investigator or something.

Page 62

1    Q. What did he ask you?
2    A. Same thing you asked me: What happened?
3    Q. What did you tell him?
4    A. Same thing. Told him the argument between me
5 and him was on -- he was trying to put it like I was at
6 fault, and he totally started disrespecting me. And I
7 said, "We're not going to play these games here." Then
8 he said he want me to write down what happened. So I
9 told him -- I said, "My writing is not good." So he got
10 upset and he like left.
11    Q. But Officer Cropper did come to you and was
12 asking you questions?
13    A. Right.
14    Q. And you told him what happened?
15    A. Right. But he supposedly -- the report
16 supposed to have been done, I'm quite sure. And it
17 wasn't. He didn't come back to me no more. I heard no
18 more about that. I didn't see him no more. So, I mean,
19 that was the end of that. That was unprofessional right
20 then and there.
21    Q. Okay. I want to talk for a moment about the
22 treatment that you received after, the medical treatment.
23     MS. TROSS: I am handing the court
24 reporter what is going to be marked for purposes of this

Page 63

1 deposition as Davis Exhibit No. 4.
2     (Davis Deposition Exhibit No. 4 was
3 marked for identification.)
4     THE WITNESS: What is this? The
5 treatment after? Before?
6 BY MS. TROSS:
7    Q. It says Radiologic Consult.
8     You see where it says that at the top?
9    A. Oh, yeah.
10    Q. Underneath that it says William F. Davis, III.
11 Correct?
12    A. Right.
13    Q. All right. Now, it says Date of Service and
14 6/1/2004.
15    A. Right.
16    Q. So this would have been the day after the --
17    A. Eleven days.
18    Q. Well, according to your complaint, Mr. Casey
19 hit you on May 31st. Correct?
20    A. Right.
21    Q. This was done June 1st, the next day.
22    A. That's wrong then. Something is wrong.
23 Because there was -- I know it was 11 days altogether --
24 five days on the tier -- between five to six. And then I

Page 64

1 went to the infirmary for another probably five --
2 whatever -- five -- again, I know it was 11 days. And
3 then I went to the surgeon.
4    Q. Okay. Let's just go through and read through
5 this. Now, according to this, up in the top left-hand
6 corner, it says this was done at -- it appears to be
7 St. Francis Hospital --
8    A. Right.
9    Q. -- at 7th and Clayton Streets.
10     Then, as I stated, it has your name.
11 And it says the date of the service as 6/1/2004.
12    A. Like I told you, I had two different x-rays.
13    Q. Okay.
14    A. This is probably the first one.
15    Q. Okay. Under Report of Findings, it says,
16 History: Injury. And then it says: Radiographs of the
17 mandible were performed. Do you know what the mandible
18 is?
19    A. No.
20    Q. Okay. I believe the mandible is your jawline.
21    A. Right.
22    Q. So it says there's bilateral mandibular
23 fracture, which appears to be consistent with what you
24 were saying -- that your jaw was broken.

Page 65

1    A. Right.
2    Q. According to this, your consult was done on
3 June 1st, 2004, the day after the incident. Do you
4 remember being x-rayed on June 1st, 2004?
5    A. I know I was x-rayed two different hospitals.
6 I was x-rayed at St. Francis --
7    Q. Mm-hmm.
8    A. -- and I was x-rayed at Christiana.
9    Q. Okay.
10    A. Two different days. I don't know how many
11 days apart. It might have been like a week each -- a
12 week apart. It wasn't --
13    Q. Okay.
14    A. I know it was like -- it wasn't close together
15 like four days here or X amount of days. I know I had
16 two different days of x-rays before I got surgeon --
17 surgery done on it.
18    Q. Okay. But someone took you to get x-rays?
19    A. Right.
20    Q. According to this, you were taken the day
21 after your injury. Do you remember that?
22    A. It wasn't the day after.
23    Q. It wasn't.
24     So this report --

William Frederick Davis, III

18 (Pages 66 to 69)

Page 66

1    A.  Right.
2    Q.  -- is wrong?
3    A.  Right.  That was impossible.
4    Q.  So you're saying the hospital's report is
5  wrong?
6    A.  Right.  It wasn't the day after.
7    Q.  Okay.
8    A.  I do know that.  I don't know how they got
9  that figure.
10    Q.  Why do you think the hospital would have the
11  wrong date on their report?
12    A.  I don't know.  Because I know I got two
13  different x-rays.  And -- because that was my argument.
14  If that's the case -- they're saying it happened the day
15  after.  It wouldn't make sense for me to be
16  complaining.  See what I'm saying?  I didn't eat for all
17  these days.
18    Q.  Right.
19    A.  That don't even make sense.
20    Q.  Right.
21    A.  You know, that's crazy.
22    Q.  So, then, if the report date is accurate, you
23  agree that it doesn't make sense?
24    A.  Right.

Page 67

1    Q.  Okay.
2    A.  It doesn't.
3    Q.  Okay.
4    A.  I mean, that means -- what I'm saying is
5  that's enough to make me an idiot.
6    Q.  Well, I wouldn't say you were an idiot.
7    A.  That would.  To me that would be saying I'm an
8  idiot, saying I was complaining and I couldn't eat for
9  four or five days.  And in that case -- and then I said
10  they knew about the problem and they didn't do nothing
11  about it.  But then if you go by this, that means they
12  did know about the problem.
13    Q.  Right.
14    A.  That wouldn't make sense.
15    Q.  Okay.
16    A.  So the date got to be wrong.
17    Q.  Okay.  But you don't think the hospital was
18  lying?
19    A.  No.  People make errors.
20    Q.  So you think it was an error?
21    A.  It got to be.
22    Q.  Okay.
23    A.  I ain't got to think about that one.
24    Q.  Mr. Davis, I'm going to hand the court

Page 68

1  reporter what's going to be marked as Davis Exhibit
2  No. 5.
3        (Davis Deposition Exhibit No. 5 was
4  marked for identification.)
5        THE WITNESS:  Because I got me a bill
6  saying when they put me to sleep.  And that date is not
7  that same date.
8  BY MS. TROSS:
9    Q.  Well, when they put you to sleep, was that for
10  surgery?
11    A.  Right.
12    Q.  Okay.  This was just an x-ray.
13        Is it possible --
14    A.  Oh, oh.  Oh, the x-ray.
15    Q.  Is it possible the x-ray was done on June 1st?
16    A.  That -- well, my misunderstanding.  Okay.  I'm
17  thinking about the x-ray -- no.  This might be right.
18    Q.  Okay.
19    A.  I was talking about the day -- between the day
20  that it happened and the day I got operated on.
21    Q.  So you're saying 11 days occurred between the
22  day it happened and the day you got operated on?
23    A.  Right, right.  I got that bill saying it was
24  that long.

Page 69

1    Q.  Right.
2        And in between that time you had x-rays
3  done?
4    A.  Two x-rays.
5    Q.  Okay.  So two x-rays and then --
6    A.  Two different hospitals.
7    Q.  And then your surgery?
8    A.  Right.  My surgery was July 11th.
9    Q.  Okay.
10    A.  I remember that, because I got the bill.
11    Q.  Can you send me a copy of the bill?
12    A.  Should I?
13    Q.  If there's something in it that you feel is
14  confidential, you can feel free to black it out and send
15  me a copy that way.
16    A.  You can get the same thing I get.  Go right
17  where I got it at.
18    Q.  Well, the only way I can get the same thing
19  that you have is if you're willing to sign a release so
20  that I can obtain copies of your medical records.
21    A.  Well, how am I going to do that?
22    Q.  I can send you the release.  You can sign it
23  and send it back to me.
24    A.  All right.

Page 70

1    Q.  And I'll get a copy --
2    A.  That would be easier to get -- to do it that
3  way.  I'll just sign something -- any medical information
4  you need.
5    Q.  Okay.  So I'll send you that either today or
6  tomorrow.
7    A.  Right.
8    Q.  When you get it, just sign it and return it
9  back to me.
10    A.  Right.
11    Q.  When I get a copy of your records, I'll send
12  you a copy.
13        MR. HAGER:  I would like to join in that
14  request, so it would be both of us.
15        THE WITNESS:  Go ahead.  It doesn't
16  matter.
17        MR. HAGER:  Thank you.
18  BY MS. TROSS:
19    Q.  So take a moment to review Davis Exhibit 5.
20    A.  All right.
21    Q.  Do you recognize this document?
22    A.  Mm-hmm.  It's a grievance.
23    Q.  Did you write this grievance?
24    A.  No.

Page 71

1    Q.  Who wrote the grievance?
2    A.  Here we go again.  It was another handwriting.
3  I'm saying -- like I say (indicating).
4    Q.  Okay.  So someone else wrote the grievance for
5  you?
6    A.  Right.
7    Q.  According to the grievance, it was written on
8  Friday, July 16th, 2004.
9    A.  Right.
10    Q.  Now, why did you wait until July 16th to have
11  someone write this grievance for you?
12    A.  Probably because a lot of stuff was going on
13  back then.  My jaw was messed up.  And I was so
14  frustrated of the whole episode between calling me a
15  "child molester" and all these instances that happened on
16  this tier.  Like I said, again, a lot of stuff happened
17  on that tier that shouldn't happen, because I was coming
18  there -- well, my understanding was I was coming in for
19  treatment, because, you know, I came in with being
20  depressed.  And it was a nightmare.  And it just had me
21  just -- I couldn't even focus on my treatment.  How could
22  I get treated?  And I'm getting abused at this facility.
23  An it was just -- that's why dates and stuff was like --
24  you know, you asked me why I waited?  Really I don't even

Page 72

1  know.  Between that and my jaw being messed up and all
2  that, it was just -- I was just overwhelmed, I guess, of
3  what's going on.  I really don't have an answer why I
4  didn't do it sooner or right away or I waited.  It was
5  just, you know...
6    Q.  Did you tell the person what to write?
7    A.  Yes.
8    Q.  Did they turn it in for you?
9    A.  No.  I turned it in.
10    Q.  Did you read it before it was turned in?
11    A.  Right.
12    Q.  Is anything in the grievance wrong?
13    A.  Let me see.  Well, the only difference I seen
14  is between Mayes and -- Mayes and Davies should be vice
15  versa.  I'd say it was right.
16    Q.  Is there anything you would like to add to
17  this grievance?
18    A.  I can't add nothing to it.
19        How you going to do that?
20    Q.  Let's flip to the next page of the exhibit.
21    A.  (The witness complied with counsel's request.)
22    Q.  Do you recognize this document?
23    A.  I think this is in the back of the grievance,
24  I think.

Page 73

1    Q.  Did you receive this document?
2    A.  I think it's on the back of all of them.  I
3  can't remember if they give this to you or if it's on the
4  back.  I think they give this to you.
5    Q.  Okay.
6    A.  I think they give it to you.  Yeah.
7    Q.  So you were given this.  It says by Sergeant
8  Moody.  Do you remember being given this by Sergeant
9  Moody?
10    A.  I think he just mailed it to me.
11    Q.  Okay.
12    A.  I don't think she presented it to me.  They
13  just mailed it -- as a matter of fact, that's what they
14  do.
15    Q.  According to the memo, the box that's marked X
16  says:  Inmates cannot request or demand disciplinary
17  action on staff.  If you have a complaint regarding
18  staff, write a letter to that person's supervisor.  In
19  this case, that is Captain Bamford, 4:00 to 12:00 shift
20  commander.
21    A.  Right.
22    Q.  Did you write a letter to Captain Bamford?
23    A.  I can't even remember if I did or didn't.
24    Q.  Would you still have a copy of that letter?

William Frederick Davis, III

20 (Pages 74 to 77)

Page 74

1    A.  If I did write a letter to him, it would be
2  the same thing -- that -- what we was talking about
3  earlier.
4    Q.  Page 3 --
5    A.  Right.
6    Q.  -- of the motion to amend?
7    A.  Right.
8    Q.  Okay.  On the next page, there is an X by:
9  Action request is inappropriate or not completed.  Inmate
10  must make an actual request, such as request that an
11  investigation be conducted.  Did you file a grievance
12  asking that an investigation be conducted?
13    A.  So what they mean by that?  Because they got
14  "or not completed."  Is that the question?  So what do
15  they mean by that?
16    Q.  I think they're telling you to file a
17  grievance and ask for an investigation.  Did you file
18  another grievance?
19    A.  I didn't file another grievance because I was
20  satisfied with the answer that they gave me.
21    Q.  Okay.  So you were satisfied with the results
22  of this memo?
23    A.  Right.
24    Q.  Did you ever appeal the decision in this memo?

Page 75

1    A.  No.  I was satisfied with it.
2    Q.  Okay.
3    A.  Why would I appeal it?
4      MS. TROSS:  Does anyone need a break?
5      THE WITNESS:  No.
6      MR. HAGER:  I'm okay.
7  BY MS. TROSS:
8    Q.  Okay.  Mr. Davis, let's talk for a moment
9  about the injuries you received as a result of the fight
10  with Mr. Casey.
11    A.  Not that again.
12    Q.  One more time.  I just need to go over it in
13  detail.
14    A.  Man.
15    Q.  What injuries do you believe you received as a
16  result of the fight with Mr. Casey?
17    A.  A shattered jaw.
18    Q.  Anything else?
19    A.  The numbness in my bottom lip, my chin.  I
20  lost a tooth.  And my teeth were bothering me.  And they
21  bother me now for some reason.  They -- I think because
22  of the nerves, because they said it was a real bad break.
23  And they said it's going to be a problem all my life.
24  And since 2004 -- and 2007 -- it's still going on.

Page 76

1    Q.  When you say "they" said, who are you
2  referring to?
3    A.  The doctor.
4    Q.  Do you have any other injuries?
5    A.  No.  Just the scars, the screws in my jaw.
6    Q.  Did you ever file a sick call slip for any of
7  your injuries?
8    A.  I can't remember if I did.
9    Q.  If you still have copies of some of those sick
10  call slips, if you could please send me a copy.
11    A.  Right.
12      MR. HAGER:  And I would join in that.
13      THE WITNESS:  Right.
14      MR. HAGER:  I'd get a copy.
15      MS. TROSS:  That's fine.
16  BY MS. TROSS:
17    Q.  When was the first time you saw a nurse for
18  your shattered jaw?
19    A.  Same day of the incident.  After the five or
20  six days, that's when the second time I seen somebody,
21  the nurse or doctor.
22    Q.  When was the first time you saw a doctor?
23    A.  The same day it happened.  Well, not a doctor,
24  but Nurse Jeremy.

Page 77

1    Q.  When was the first time you saw an actual
2  doctor, though?
3    A.  I didn't.  The surgeon on the street.
4    Q.  When you say "on the street," you mean --
5    A.  I mean --
6    Q.  -- outside of prison?
7    A.  Right.  Yeah.  Out there.  Outside prison.
8    Q.  Okay.  What treatment did you receive for your
9  shattered jaw?
10    A.  What you mean?  Before or after?
11    Q.  After.
12    A.  I can't remember.  Really nothing.  Just -- it
13  was -- I had braces.  They gave me braces on my teeth.
14    Q.  So you had surgery; correct?
15    A.  Right.
16    Q.  And you had the braces?
17    A.  Yes.
18    Q.  Did you have anything else?
19    A.  No.
20    Q.  Were you prescribed any medication?
21    A.  Yeah.  I can't -- probably so.  I just can't
22  remember it.  Probably some pain medicine.  But I still
23  was in a lot of pain.  I'm sure it was something.
24    Q.  When did your jaw start to get better and

Page 78

1  heal?
2      A.  I stayed in the infirmary probably like a
3  week, two weeks.  I can't really remember.
4      Q.  A week, two weeks after surgery?
5      A.  Yes.
6      Q.  Are you currently receiving any treatment for
7  your shattered jaw?
8      A.  I went to a -- the dental about three months
9  ago and complained about why my upper and my lower, you
10  know, is bothering me.  Like right now all of this is
11  bothering me still.  I told them at Gander Hill too the
12  same thing.  He said, because the nerve damage was really
13  severe, it's not going to get better.
14      Q.  Was there anything that they could do for you?
15      A.  Nope.
16      Q.  Did they prescribe you any medication?
17      A.  Nope.
18      Q.  Have you recently had to fill out any sick
19  call slips as a result of your jaw pain?
20      A.  Mm-hmm.
21      Q.  When was the last time you filled out a sick
22  call slip?
23      A.  Like I said, three months ago I talked to the
24  dentist about it.

Page 79

1      Q.  So that was here at DCC?
2      A.  Mm-hmm.  That was after I got my teeth
3  cleaned.  I got my teeth cleaned.  And I told him about,
4  you know, my jaw.  And they did x-ray and they seen the
5  screws and stuff.  And I told him and all that.
6      Q.  Are you currently taking any medication for
7  your jaw?
8      A.  No.
9      Q.  What about for your teeth?
10      A.  No.
11      Q.  Let's talk a moment about the damages you're
12  requesting.  According to your complaint, you're asking
13  for $50 million.  How did you arrive at that number?
14      A.  I know that number be outrageous, but it's
15  something I have to live with all my life.  And the pain
16  that I went through when nobody would do nothing for me.
17  It was like they ignored me.  And, you know, my thing is
18  just all of this could have been prevented if they did
19  the right thing.
20      Q.  So --
21      A.  I wouldn't even got my jaw broke.
22      Q.  So if $50 million is outrageous, what do you
23  believe is more reasonable?
24      A.  I don't know.  I haven't really gave it no

Page 80

1  thought.
2      Q.  Okay.  Do you have any medical bills as a
3  result of your injury?
4      A.  They forward that information to the
5  institution.
6      Q.  So the institution paid for your surgery?
7      A.  Yes.
8      Q.  Were you unable to work as a result of your
9  injury?
10      A.  No. .I just couldn't eat.
11      Q.  Okay.  This is my last exhibit.
12          I'm handing the court reporter what's
13  going to be marked for purposes of this deposition as
14  Davis Exhibit No. 6.  After he's handed it to you, just
15  take a moment to review it.
16          (Davis Deposition Exhibit No. 6 was
17  marked for identification.)
18  BY MS. TROSS:
19      Q.  Finished?
20      A.  Yeah.
21      Q.  Okay.  The court reporter has just handed you
22  the State Defendants' Combined First Set of
23  Interrogatories and Requests For Production of Documents
24  Directed to Plaintiff.  This document was mailed to you

Page 81

1  on January 11, April 10 and May 7th.
2          Have you seen it before?
3      A.  Yeah.
4      Q.  Do you understand that in accordance with the
5  federal rules your responses to these questions were due
6  30 days after they were filed?  So they were due about
7  February 11th.
8      A.  Right.
9      Q.  Did you ever file a response --
10      A.  No.
11      Q.  -- to the questions?
12      A.  I couldn't --
13      Q.  How come?
14      A.  Because I couldn't get the information.  I'm
15  not a writer.  And I can't -- I'm saying, if you look at
16  this, somebody did this for me.
17      Q.  Okay.  So let's verbally discuss just a few of
18  the questions.  We're not going to go through all of
19  them, just a few of them.
20          First turn to page 6.
21      A.  (The witness complied with counsel's request.)
22      Q.  Looking at Interrogatory No. 2, have you ever
23  had any communications with anyone concerning the
24  allegations in your complaint?  For example, any letters

William Frederick Davis, III

22 (Pages 82 to 85)

Page 82

1  or journals? Diaries?
2      A.  No.
3      Q.  Have you communicated with any of the
4  defendants regarding the allegations in your complaint?
5      A.  No.
6      Q.  What documents do you have in your possession
7  that relate to the allegations in your complaint?  For
8  example, any grievances or sick call slips?  What
9  documents do you have that support your complaint?
10     A.  I don't know.  I've got to look back.  Because
11  what happened -- a lot of my -- some stuff -- when you
12  go -- with me being bounced around and going -- a couple
13  times I went to the hole.  Guards figure some of your
14  papers are not important or they got something against
15  you or like that.  And they throw a lot of stuff away.
16  So a lot of stuff gets purposefully thrown away.  That's
17  another problem too that's going down.  But there's
18  nothing I can do about that.
19     Q.  On page 7, Interrogatory No. 6, can you
20  identify for me any individuals who witnessed the fight
21  or what occurred on the basketball court?
22     A.  As I say, the people and the names -- there's
23  no way I can figure that out, I mean, because I don't
24  know where they at.  The only ones that witnessed it is

Page 83

1  the officers that was there who witnessed the incidents
2  and all that.
3      Q.  Okay.  Let's turn to page 13, Interrogatory
4  No. 16.  Can you describe for me any information
5  regarding any mental or behavioral problems that you have
6  even been diagnosed with and who, if you remember,
7  diagnosed you?
8      A.  Depression.  I don't know the doctor name.
9      Q.  Do you remember when you were diagnosed with
10  depression?
11     A.  No.  Depression and bipolar.  And the way he
12  described it, everybody got that.
13     Q.  Do you remember when you were diagnosed as
14  bipolar?
15     A.  No.
16     Q.  Okay.  Interrogatory No. 17:  Could you
17  describe for me any incidents you've had where you were
18  accused of or found guilty of fighting or disorderly or
19  threatening behavior?
20     A.  One discipline -- threatening behavior, I
21  guess.  One of the guards wouldn't let me use the
22  bathroom.
23     Q.  Okay.
24     A.  That one.

Page 84

1      Q.  Anything else?
2      A.  There was another incident.  They say I was
3  fighting.  I went to Mayes about this one particular
4  inmate got in my face.  And I went to Mayes to tell
5  him -- you know, to discipline him again.  This is
6  another incident.  And he said he was going to talk to
7  the individual.  I don't know if he did or didn't.  And I
8  guess like two, three days after that I was standing at
9  the table.  And this same individual said he was going to
10  punch me in my face.  I'm like, yo, man, get out of my
11  face, because he -- I had a problem with him earlier, and
12  I went to Mayes about him.  And I just like pushed him on
13  the ground and held him there so -- he wanted to --
14  attempted to try to hit me.  And Mayes called it a fight.
15  There wasn't no punches thrown or none of that kind of
16  stuff.  I just held him down at the table.  And that was
17  it.
18     Q.  Have you had any other incidents where you've
19  been found guilty of fighting?
20     A.  No.  That's the only one was that.
21     Q.  Okay.  Page 14, Interrogatory No. 19.
22     A.  Oh, yeah.  Matter of fact -- oh, another one.
23  My fault.
24     Q.  Okay.

Page 85

1      A.  Since I've been here, a guy hit me, and they
2  said it was fighting.  And they found out it was a lie.
3  And they put me in the hole.  And mental health got me
4  out of the hole because they found out it was bogus.  And
5  that there --
6      Q.  Okay.
7      A.  -- they put me back over there.
8      Q.  Okay.
9      A.  And other dumb stuff.
10     Q.  Turn to page 14, Interrogatory No. 19.
11     A.  (The witness complied with counsel's request.)
12     Q.  Can you identify for me your criminal
13  convictions in the past 15 years?
14     A.  Well, burglary.
15     Q.  Is that your present --
16     A.  Yeah.
17     Q.  Anything else?
18     A.  That's the main thing -- burglary.
19     Q.  Okay.  So you said you're presently
20  incarcerated for burglary; correct?
21     A.  Right.
22     Q.  When did your present incarceration begin?
23  When did you start?
24     A.  2002.  That's when it happened.

Page 86

1    Q. What sentence did you receive?
2    A. Eleven years.
3    Q. Do you know your short-term release date?
4    A. 2013.
5    Q. And your max date?
6    A. That's it.
7    Q. Okay. Were your charges resolved by plea or
8 by trial?
9    A. Plea.
10    Q. Approximately how much of your adult life have
11 you spent incarcerated?
12    A. Most of it.
13    Q. Have you ever been convicted of a crime of
14 dishonesty, such as robbery, perjury?
15    A. Uh-uh.
16    Q. Is that no?
17    A. I mean no. I'm sorry.
18    Q. Have you ever been found guilty of any
19 disciplinary violations while you were incarcerated which
20 in any way involved dishonesty?
21    A. No.
22    Q. Were you ever involved in smuggling contraband
23 into Howard Young?
24    A. Never.

Page 87

1    Q. Were you ever involved in smuggling contraband
2 into DCC?
3    A. Never.
4    Q. Have you ever approached a correctional
5 employee --
6    A. Never.
7    Q. Let me finish my question.
8      Have you ever approached a correctional
9 employee in an effort to convince them to help you
10 smuggle contraband into Howard Young?
11    A. Never.
12    Q. Or into DCC?
13    A. Never. That's a real criminal. I'm not a
14 real criminal.
15    Q. Do you intend to call any witnesses if this
16 case goes to trial?
17    A. Yes. I would try to.
18    Q. Who do you intend to call?
19    A. I don't know.
20    Q. Do you have any idea?
21    A. Not right offhand, no.
22    Q. Do you intend to call any expert witnesses if
23 this case goes to trial?
24    A. Yes. Everybody.

Page 88

1    Q. Like who?
2    A. I don't know.
3    Q. Okay.
4    A. Mainly, I guess, medical.
5    Q. When you say "medical," are you referring to
6 current medical providers or your surgeon? Who are you
7 referring to?
8    A. Surgeon. The findings and then the long-term
9 effect and, I guess, dealing with my mental state.
10    Q. Okay. At this time would you like to change
11 the answer to any question that was asked?
12    A. No.
13    Q. That concludes my questioning. You are
14 permitted at this time to make a statement in response to
15 the case. You may not ask me any factual or legal
16 questions because I'm not a party to the case. But if
17 you want, you're free at this time to give a statement
18 about anything involving the case.
19    A. Well, I don't have nothing. I just want it
20 over with so I can go on with my life.
21    Q. Anything else you want to add?
22    A. No.
23      MS. TROSS: Okay. I'm going to turn
24 over the deposition to Ms. Debra, as you refer to her --

Page 89

1 her counsel, Mr. Hager.
2 BY MR. HAGER:
3    Q. How you doing?
4    A. Fine.
5    Q. You need a break?
6    A. No.
7    Q. Okay. I'm just going to go back through some
8 of my notes here. You identified three incidents where
9 you were disciplined. A guard wouldn't let you use the
10 bathroom.
11    A. Right.
12    Q. There was the fighting where you pushed the
13 individual down on the table.
14    A. Right.
15    Q. No punches.
16      And since you were here, you said that
17 there was something about some guy hit you.
18    A. Correct.
19    Q. They said you were fighting.
20    A. Right.
21    Q. And you said it was bogus.
22    A. Right.
23    Q. The first one where you weren't allowed to use
24 the bathroom, where did that occur?

24 (Pages 90 to 93)

## Page 90

1    A.  1D.
2    Q.  Here or in Gander Hill?
3    A.  Gander Hill.
4    Q.  Gander Hill.
5        And the fighting where you pushed the
6    individual --
7    A.  1D.
8    Q.  Okay.  Now, did they happen before the
9    incident with your jaw?
10   A.  No.  That happened -- because I came back and
11   forth out of the jails.  I don't know exactly when that
12   one happened.  I don't know if it was on that occasion or
13   one prior back.  I don't know.
14   Q.  Okay.  I probably asked a bad question there.
15       The incident where the guard wouldn't
16   let you use the bathroom, do you know if that happened
17   before or after the incident with your jaw?
18   A.  Before.  I think it was before.  I'm not
19   really sure.
20   Q.  Okay.  The incident where you pushed the
21   inmate down on the table --
22   A.  That's -- I don't know which one -- because I
23   was in and out of jail, I don't know exactly when that
24   happened.

## Page 91

1    Q.  Can you identify the inmate that you pushed
2    down?
3    A.  No.
4    Q.  You don't know who it was?
5    A.  I forgot his name.
6    Q.  Now, the one where it was bogus, that was
7    after the incident with your jaw.  Correct?
8    A.  Right.
9    Q.  When you were diagnosed with depression, was
10   that made before you were incarcerated or after you were
11   incarcerated?
12   A.  After.
13   Q.  How about the bipolar disease?  Was that --
14   A.  Same thing.  Both of them together.
15       THE WITNESS:  When is all this going to
16   be over?  That's what I want to know.
17       MR. HAGER:  I can't answer that
18   question.
19   BY MR. HAGER:
20   Q.  When did you go to see the surgeon for your
21   broken jaw?
22   A.  When I was -- what did I say?  August 11th.
23   One of them dates.
24   Q.  One date you gave us was July 11th.

## Page 92

1    A.  Huh?
2    Q.  One date you give us was July 11th.  You said
3    you had a bill.
4    A.  Yeah.  July/August.  Yeah.  I mean, the
5    dates -- I know they important, though.  But it's almost
6    like they're -- August 11th.
7    Q.  Okay.  Anytime between August 11th and --
8    A.  Was it August 11th?
9    Q.  Is it fair to say you remember the 11th?  You
10   don't remember the month?
11   A.  Because if the fight happened -- I said
12   May 31st.  January, February, March, April, May, June --
13   yeah, June.  June 11th I seen the surgeon.  June 11th.
14   Q.  How many days after the incident did you go to
15   see him?
16   A.  Altogether it was eleven days.
17   Q.  The 11th day is when you had the surgery?
18   A.  Right.
19   Q.  Did you ever see a surgeon before the surgery
20   after the incident?
21   A.  No.
22       The seventh month is what?  The seventh
23   month is August.  Right?  I mean -- I'm getting mixed up
24   on these dates.

## Page 93

1    Q.  In Exhibit No. 5, that is the grievance form
2    you have.
3    A.  Right.
4    Q.  There's a signature on there.
5        Is that your signature?
6    A.  Yes.
7    Q.  Okay.
8    A.  Let me see.  Yeah.  That's my signature, yeah.
9    Q.  How is it that you remember Inmate Casey's
10   name?
11   A.  Oh, well, he's well known, because the way he
12   carried himself the first time brung a lot of attention
13   to himself -- his conduct.
14   Q.  Do you know if that's his real name or not?
15   A.  Yeah.  That's his real name.
16   Q.  Just prior to the incident in the fight where
17   he hit your jaw, how often were you seeing your
18   counselor?
19   A.  All the time.
20   Q.  Did you go once a week?  Once a day?
21   A.  Sometime two times a week.  Once a week.  It
22   was pretty regular.  Pretty regular.
23   Q.  Who was your counselor?
24   A.  Debra Muscarella.

Page 94

1    Q.  What does she look like?
2    A.  She's attractive.  That's all I know.
3    Caucasian, black hair, medium height.
4    Q.  What do you allege in particular that she did
5    that damaged you?
6    A.  What you mean by did damage?  What you mean?
7    Q.  Well, you've sued her for damages.
8    A.  Right.
9    Q.  What is your complaint against her?
10   A.  I went to her several occasions about Brian
11   Casey calling me a "child molester."  Plus, again, they
12   don't use the level system.  She don't use that level
13   system that should be placed when people act out and
14   stuff like that.  I only seen it done maybe once or
15   twice.  Maybe.
16   Q.  Okay.  Let's go to the --
17   A.  There's a lot of cover-up on that tier.
18   Q.  Now, Debra Muscarella was your counselor.
19   Correct?
20   A.  Right.
21   Q.  Did you understand that you had a relationship
22   of confidentiality?  In other words, you would tell her
23   stuff and she would not pass it on?
24   A.  Right.

Page 95

1    Q.  Okay.  Did you ever tell her to tell anybody
2    about Brian Casey calling you a "child molester"?
3    A.  Huh?
4    Q.  Did you ever tell Debra Muscarella I want you
5    to go to somebody and report that Brian Casey is calling
6    me a "child molester"?
7    A.  I mean, that there could be altered with your
8    consent.  You have to agree to allow certain information
9    to be left, you know -- what we went through to go to it.
10   Q.  Did you ever tell her to do that?
11   A.  No, I didn't really tell her to really do
12   that.  I just told -- she told me she was basically going
13   to take care of it.  She told me don't worry about it.  I
14   said, "What you mean don't worry about it?"  I said,
15   "It's been going on too many times."  And she keeps
16   saying, well, today this, dah-dah-dah-dah-dah and on and
17   on and on.  And nothing ever got done.
18   Q.  How many times do you think you told her?
19   A.  I can remember --
20   Q.  Did it come up --
21   A.  -- four.
22       I'd say about four times.  I'm guessing
23   about four times.
24   Q.  Do you remember months?

Page 96

1    A.  No.
2    Q.  Dates?
3    A.  No.  There was no way I could remember that.
4    Q.  But this was prior to --
5    A.  Right.  Oh, yeah.  Right.
6    Q.  -- the breaking of your jaw?
7    A.  Right.
8    Q.  Was it prior to either of the incidents that
9    you described with the basketball?
10   A.  Right.  It was -- right.  In with that.  Prior
11   to that.
12   Q.  So --
13   A.  Prior to the incident with the basketball.
14   Q.  There were two incidents on the basketball
15   court.
16   A.  Right, right.
17   Q.  Did you tell her before either of them?
18   A.  Before and after.  I told her a lot.
19   Q.  Okay.
20   A.  Because I got really tired of it.
21   Q.  Now, in your complaint you said that you
22   didn't get to go to the infirmary until after she
23   intervened on your behalf.
24   A.  Right.

Page 97

1    Q.  Is that right?
2    A.  Right.
3    Q.  When did you see her after the incident with
4    your jaw?  What day, do you remember?
5    A.  I don't know the exact day.  It was like --
6    well, it was right after my jaw was broke.  And I was
7    telling her, you know -- well, how can I get down to the
8    infirmary?  And I went to her every day, every day, every
9    day, till it happened.  I went to her every day, because
10   I couldn't eat.
11   Q.  So the day of the incident --
12   A.  Right.
13   Q.  -- you went to the infirmary.
14   A.  Right.
15   Q.  Did you see her that day?
16   A.  Not that exact day, no.
17   Q.  The next day?
18   A.  The next day I seen her.
19   Q.  Did you tell her you wanted to go to the
20   infirmary?
21   A.  From that day till I finally got down there.
22   Q.  Is it your understanding that she was the one
23   who intervened to get you down there?
24   A.  Right.

William Frederick Davis, III

26 (Pages 98 to 101)

Page 98

1    Q.  Was she involved in any way in the treatment
2  of your jaw other than getting you to the infirmary?
3    A.  No.
4    Q.  Regarding Nurse Jeremy that you saw, the only
5  thing he did for you was put --
6    A.  Gauze in my mouth.
7    Q.  Did he give you any ice?
8    A.  I can't remember if he gave me any ice or not.
9  Because I was in shock.  You know what I mean?  When your
10  jaw get like that, everything else is, like, whatever.
11    Q.  Do you know where on your jaw Mr. Casey's fist
12  hit?
13    A.  No.  Not exactly.
14    Q.  Center?  Side?
15    A.  Not exactly, no.
16    Q.  Okay.  Did Nurse Jeremy ever come down to your
17  pod --
18    A.  I never seen him.
19    Q.  -- to see you?
20    A.  I never seen him no more since that day.
21    Q.  Prior to the incident where you broke your
22  jaw, were you taking any medications?
23    A.  For the depression and bipolar.
24    Q.  What medications were you taking?

Page 99

1    A.  I don't know the name of them.
2    Q.  Were you on those medications the day that you
3  got into a fight with Mr. Casey -- or Mr. Casey got in a
4  fight with you?
5    A.  Probably, yeah.
6    Q.  Were you taking those medications either of
7  the days --
8    A.  Yeah.
9    Q.  -- with the incident with the basketball
10  court?
11    A.  Yeah.
12    Q.  Okay.  How often did you take those
13  medications?
14    A.  Once a day.
15    Q.  Did you take them today?
16    A.  I don't take them no more.  I been stop taking
17  that stuff.
18    Q.  Why did you stop?
19    A.  Because it don't work.  If God can't fix it,
20  it ain't going to get fixed.
21    Q.  What is the depression medicine supposed to
22  do?
23    A.  Cure the depression.
24    Q.  And are you depressed now?

Page 100

1    A.  Yes.  I want to go home.
2    Q.  Fair enough?
3    A.  No.  Everything is fine.
4    Q.  How about the bipolar disorder?  What are the
5  manifestations of that, do you know?
6    A.  That's what I didn't understand.  The way they
7  was telling me I had bipolar I really didn't understand.
8  That's why I'm saying I think we all got it.  The way
9  they done described it to me, I didn't really understand
10  bipolar.  I guess it's kind of a mood swing.
11    Q.  Your understanding was that you had some type
12  of mood swings?
13    A.  Right.
14    Q.  And the medication was supposed to prevent
15  that?
16    A.  That's what they say.  That's why I stopped
17  taking it, because, you know, I'm doing fine.
18    Q.  Okay.  When you were getting it regularly
19  before you stopped it, did you take it every day as you
20  were supposed to?
21    A.  Right.  They're pretty good at keeping up with
22  medications, people not taking them and stuff like that.
23  My argument was why Brian Casey was on that tier.  Why
24  did they bring him back?  That wasn't -- that was -- I

Page 101

1  didn't understand that.  Just say -- I do understand them
2  bringing him back.  He should be highly monitored because
3  the way he displayed that behavior.  And then they
4  removed him.  But it ain't happening.  And he's running
5  around like an animal.  And that shouldn't happen,
6  calling people them kind of name.  That name there -- any
7  name between molesting or that type stuff in jail you
8  just don't do.  It's not tolerated.
9    Q.  If someone calls you that name, how is the
10  only way you can set the record straight -- or how are
11  the ways you can set the record straight?
12    A.  My status sheet.
13    Q.  Pardon me?
14    A.  My status sheet.
15    Q.  Did you ever show Mr. Casey your status sheet?
16    A.  No.  None of his business.
17    Q.  You said Debra Muscarella was the one who
18  initiated the level discipline?
19    A.  Yes.  What she do, she find out what to do,
20  then pass it on to an officer, and he enforces it.
21    Q.  Do you know if she ever went to an officer
22  when you told her you were called a "child molester"?
23    A.  To my knowledge, I don't know.
24    Q.  Okay.

Page 102

1    A.  But I do know she knew about it.  Reynolds --
2  I didn't put Reynolds in the lawsuit.  But Reynolds knew
3  about it and Mayes knew about it.
4    Q.  Okay.  How about Dr. Boston?
5    A.  She should have known about it, because she's
6  the director of mental health.  If these instances
7  happening -- and she should be notified, because this
8  is her -- that's her tier.  She's in charge.
9    Q.  Did you ever tell her about it?
10    A.  No.
11    Q.  Did you ever direct that letter, page 3 of
12  Exhibit 1 --
13    A.  No, no.
14    Q.  -- to her?
15    A.  No.
16    Q.  Did you ever direct that to Debra Muscarella?
17    A.  Not directed to her, no.
18    Q.  What else --
19    A.  I might have told her about that incident
20  about me pressing charges; because I talked to her pretty
21  much about anything, because she is a counselor.  And she
22  was a good listener.  She was that.
23    Q.  Okay.  So did she offer you advice?  Did she
24  counsel you?

Page 103

1    A.  Well, particularly with this case here, that's
2  all she kept saying was she was going to take care of it,
3  basically.  Dont worry.  It wasn't that serious.  And I
4  told her it is, because it's still going on.  And it made
5  me more depressed on and on and on.  And I'm like, I
6  can't even get better.  You all supposed to be helping me
7  out, and all this abuse is happening on this tier.  It
8  don't make sense to me.
9    Q.  Didn't you have other issues you were
10  depressed about also?
11    A.  Like what?
12    Q.  Family issues, your mother.
13    A.  I did.  I mean, it was -- she's not doing real
14  bad.  But it was like -- that was one of them that kept
15  me depressed and stuff like that.
16    Q.  Did Dr. Boston ever examine you or evaluate
17  you or talk to you?
18    A.  I ain't ever seen her.
19    Q.  Do you know what she looks like?
20    A.  I think -- yeah.  I think I've seen her one
21  time.  I'm not a hundred percent sure.  I think she's
22  Caucasian.  Kind of a small built woman.  I don't think
23  she's there now.  And I'm on a similar tier, a mental
24  health tier, and it's the same thing.  It's a repeat.

Page 104

1    Q.  You talked about your -- and I'm using my
2  words here.  You blew the whistle on some people or some
3  things that were going on at the 1D tier.  You mentioned
4  the commissary and things like that.
5    A.  Right.
6    Q.  Who did you report that to?
7    A.  I don't think I reported it to nobody.  I
8  think -- I can't really remember.  Ms. Debra knew about
9  some of the incidents that was going on about -- I know
10  particularly one inmate that was taking his commissary,
11  running stores.  They were selling pills.  A lot of the
12  things they knew, but, you know...
13    Q.  Do you know who that inmate was or is?
14    A.  Yeah.  I know his first name, not his last
15  name.
16    Q.  What's his first name?
17    A.  William.
18    Q.  And he was on 1D?
19    A.  Yes.
20    Q.  He was the one that was doing it or he was the
21  victim of it?
22    A.  He was the victim.
23    Q.  He was the victim.
24         Who were the ones that were doing it?

Page 105

1    A.  The other person I don't know.  I didn't
2  see -- I'm the kind of person I don't talk to a lot of
3  people.  And that's just me.  And if I meet them, I don't
4  ask their name.  A lot of people I talk to now over
5  there, I don't -- you know, a lot of people's names I
6  don't know.  And a lot of people got substitute names and
7  they got slang.  And I don't go, well, what's his real
8  name? and all that.  Because I don't really care.  I'm
9  not really trying to get close to them.
10    Q.  But you did know Brian Casey's name; correct?
11    A.  Right.  He was well known.  Brian Casey was
12  the kind of person that ran his mouth a lot.  He did a
13  lot of bragging.  So he put his own self in the
14  spotlight.
15    Q.  Would you agree with me that the people who
16  helped you out with preparing your legal papers put
17  themselves in the spotlight too?
18    A.  What do you mean by that:  Put themselves in
19  the spotlight?
20    Q.  They make it known to other inmates that
21  they're available to help.
22    A.  I mean, that aspect, yeah.
23    Q.  So you knew who to go to when you needed help?
24    A.  Well, you go -- you ask -- some people you

William Frederick Davis, III

28 (Pages 106 to 109)

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  might see. You might be walking around. They might be
2  doing legal work. Or you might be talking to somebody
3  and they refer you to another person -- that kind of
4  stuff -- you know, who's doing legal work. And sometimes
5  you see a lot of people doing legal work and -- like
6  that. And because I talked a lot about my incident and
7  about my -- what I'm trying to do. And they just
8  volunteered to help out as much as they can.
9      Q.  And you don't know the names of any of the
10  people --
11      A.  No.
12      Q.  -- that did that?
13          MR. HAGER:  That's all I have.
14  BY MS. TROSS:
15      Q.  Mr. Davis, the court reporter is going to
16  prepare a transcript of this deposition. A transcript is
17  a typed document that contains everything that was said
18  on the record --
19      A.  Correct.
20      Q.  -- during this deposition.
21          The transcript can be used in preparing
22  a motion for summary judgment or for use at the trial,
23  should we have one in this case. The transcript is
24  available for purchase. Because you are proceeding in

**Page 108**

1  for my summary judgment motion.
2          Do you have any procedural questions you
3  would like to ask me? But please understand that I can't
4  offer you any legal advice.
5      A.  I know. No.
6      Q.  No questions?
7      A.  (The witness indicated.)
8          MS. TROSS:  Okay. This concludes the
9  deposition of William Davis.
10          (The deposition concluded at 12:10 p.m.
11  this same day.)
12          - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

**Page 107**

1  forma pauperis, I will send you a copy of the transcript
2  after the state defendants receive a copy.
3      A.  All right.
4      Q.  You have the opportunity to review the
5  transcripts for errors. You do not, however, have to
6  review the transcript if you do not want to.
7          Do you wish to obtain a copy of the
8  transcript and review it for errors?
9      A.  I guess, yeah.
10      Q.  I intend to file a motion for summary judgment
11  within the coming weeks in this matter. A motion for
12  summary judgment submits this matter to the judge for a
13  decision on whether you can present genuine and material
14  issues of fact that will require a trial. The standard
15  for summary judgment is not the same as a standard for a
16  motion to dismiss --
17      A.  Right.
18      Q.  -- and will likely require you to demonstrate
19  factual support for your allegations.
20          Once I file my motion, you are permitted
21  to file an answering brief. If you file an answering
22  brief, I have the ability to file a reply brief.
23      A.  Right.
24      Q.  This will then conclude the briefing process

**Page 109**

1          INDEX TO TESTIMONY
2
3  WILLIAM FREDERICK DAVIS, III          PAGE
4  Examination by Ms. Tross          2
   Examination by Mr. Hager          89
5
6          - - - - -
7
8          INDEX TO EXHIBITS
9
10  DAVIS DEPOSITION EXHIBIT NO.          PAGE
11
    1  Motion to Amend          32
12
    2  Form to be Used by a Prisoner in Filing          53
13     a Complaint under the Civil Rights Act
       3  Incident Report: Incident No. 3007207          57
14     4  Radiologic Consult          63
15     5  Grievance Form          68
16     6  State Defendants' Combined First Set of          80
       of Interrogatories and Requests for
17     Production of Documents Directed to
       Plaintiff
18
19
20          - - - - -
21
22
23
24

William Frederick Davis, III

Page 110

1
2
3
4
5
6
7
8       REPLACE THIS PAGE
9
10      WITH THE ERRATA SHEET
11
12      AFTER IT HAS BEEN
13
14      COMPLETED AND SIGNED
15
16      BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 111

1           C E R T I F I C A T E
2    STATE OF DELAWARE:
                        :
3    NEW CASTLE COUNTY:
4         I, Robert Wayne Wilcox, Jr., a Registered
5    Professional Reporter and Notary Public, within and for
6    the County and State aforesaid, do hereby certify that
7    the foregoing deposition of WILLIAM FREDERICK DAVIS, III,
8    was taken before me, pursuant to notice, at the time and
9    place indicated; that said deponent was by me duly sworn
10   to tell the truth, the whole truth, and nothing but the
11   truth; that the testimony of said deponent was correctly
12   recorded in machine shorthand by me and thereafter
13   transcribed under my supervision with computer-aided
14   transcription; that the deposition is a true record of
15   the testimony given by the witness; and that I am neither
16   of counsel nor kin to any party in said action, nor
17   interested in the outcome thereof.
18        WITNESS my hand and official seal this 17th day
19   of August A.D. 2007.
20
21
         _____
         ROBERT WAYNE WILCOX, JR.
22       REGISTERED PROFESSIONAL REPORTER
         CERTIFICATION NO. 101-RPR.
23       (Expires January 31, 2008)
24