IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIAM F. DAVIS, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-067-SLR |
| | ) |
| DEBRA MUSCARELLA, | ) |
| | ) |
| Defendant. | ) |

William F. Davis, III, James T. Vaughn Correctional Center, Smyrna, Delaware. Pro se Plaintiff.

Patrick G. Rock, Esquire, Heckler & Frabizzio, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: May 14, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff William F. Davis ("plaintiff"), an inmate at the James T. Vaughn Correctional Center, formerly known as the Delaware Correctional Center ("DCC"), filed this civil rights complaint pursuant to 42 U.S.C. § 1983. Presently before the court are competing motions for summary judgment filed by the parties. (D.I. 86, 92) Also before the court is plaintiff's request for counsel. (D.I. 85) For the reasons set forth below, the court will grant defendant's motion for summary judgment and will deny plaintiff's motions.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff alleges that, while housed at the Howard R. Young Correctional Institution ("HRYCI"), defendant Debra Muscarella ("defendant") failed to protect him from fellow inmate Casey ("Casey") even though he complained of Casey's conduct. Plaintiff and Casey were later involved in a fight and plaintiff's jaw was broken by Casey.

Casey and plaintiff were both housed on the mental health tier, 1D, and in the transition unit level system (i.e., the mental health special needs unit). (D.I. 61, ex. A, 7; D.I. 86, ex.) The transition unit level system is a structured system with built-in rewards and consequences for compliance or noncompliance with overall treatment. (*Id.*) Levels are determined by the mental health therapists, and security staff is consulted to provide information regarding inmate behavior. (*Id.*) Plaintiff was not required to participate in the transition unit. (D.I. 96, Muscarella aff.) Defendant, a mental health counselor and the transition unit coordinator, had authority to deny a prisoner access to the transition unit and she did not deny plaintiff's participation in counseling. (*Id.*) Plaintiff was in the transition unit voluntarily and, at any time, could have made a

request to leave. (*Id.*)

At some point in time, Casey began calling plaintiff a child molester, even though plaintiff is serving a sentence for a burglary conviction. (*Id.* at A, 4) Plaintiff believed that being called a child molester put him at risk. (*Id.* at 3) Plaintiff regularly saw defendant (once a week and sometimes twice a week), and he testified that she was aware of the allegations. (D.I. 61, ex. A, 4, 24; D.I. 87, ex. B) Plaintiff is aware that, because defendant was his counselor, they had a relationship of confidentiality. (D.I. 61, ex. A, 25) He told defendant on several occasions that Casey had called him a child molester. (D.I. 61, ex. A, 25)

December 2, 2003 interdisciplinary progress notes prepared by defendant contain subjective data provided by plaintiff: "There's still problems. People pick on me, they say stuff to me."[1] (D.I. 87, ex. B) Under objective data, defendant recorded that plaintiff "reported that some [inmates] continue to needle him about false accusations made by a former 1D resident about [plaintiff's] charges."[2] (*Id.*) The plan was to continue treatment on the transition unit. (*Id.*)

During his session with defendant on January 20, 2004, plaintiff commented, "[n]o, we weren't fightin[g] we were horseplayin[g]. I'm not mad at him. He just took the worst of it . . . ." (D.I. 61, ex. F) Defendant noted that she redirected plaintiff with respect to horseplay, particularly given his history of discord with other inmates. (*Id.*)

On March 3, 2004, when plaintiff met with defendant he stated, "[w]hy should I be

---

[1]Plaintiff states that on December 3, 2003, he reported to defendant that the inmates were Casey and Jimmy Lewis. (D.I. 94)

[2]Plaintiff states that the former 1D resident is Casey. (D.I. 97)

on Level 2? he's the main one that was startin[g] stuff, right there. He was makin[g] noise, and he got away with it. He should be on Level 2, too." (D.I. 61, ex. H) Defendant noted that plaintiff was upset at being told by her that he was on behavior modification level 2 due to his altercation with another resident. (*Id.*)

Defendant noted on March 8, 2004, that plaintiff continued to express expectations that those around him should/must adjust their behavior based on what he is going through (i.e., his mother's automobile accident). (D.I. 92, ex. K) Defendant discussed coping strategies with plaintiff to stabilize his mood and behavior patterns that tended to attract negative attention from others. (*Id.*)

A March 12, 2004 mental health services treatment plan review prepared by defendant states that "[plaintiff] has had more problems with irritability and some recent interpersonal conflicts, due in part to stress - mother injured in car accident." (D.I. 92, ex. O) During plaintiff's session with defendant on April 5, 2004, he stated "[b]asically, everything's normal." (D.I. 92, ex. K) As of April 15, 2004, plaintiff was classified for housing on the medium-high housing unit ("MHU"). (D.I. 87, ex. A) The plan was to continue treatment on the transition unit and to review plaintiff's classification with Steve Deller/classification ("Deller"). (*Id.*)

On April 23, 2004, plaintiff was transferred from 1D to 1E and remained there until April 27, 2004, when he returned to 1D. (D.I. 61, ex. E) Plaintiff next saw defendant on April 28, 2004. Interdisciplinary progress notes for that date, under subjective data, indicate that plaintiff stated, "I told him I didn't do nothin[g]. The guy hit me right in my face. It was more of the same stuff, that old dumb stuff about bein[g] a sex offender. Somebody's still got that rumor goin[g] around. I think it's all in 13. It's

-3-

not true. I don't know what I can do about it."[3] (D.I. 87, ex. A) Plaintiff continued on the transition unit. (*Id.*)

Interdisciplinary progress notes prepared by defendant and dated May 3, 2004, discuss plaintiff's classification status and note that he wished to be housed at the Sussex Correctional Institute but the classification board recommended the DCC. (D.I. 92, ex. N) The note states that defendant will consult with Deller regarding plaintiff's classification. (*Id.*)

Plaintiff testified that he complained to defendant about four times prior to the time his jaw was broken. (D.I. 61, ex. A, 25) Plaintiff testified that defendant kept saying she was "going to take care of it . . . [d]on't worry. it wasn't that serious," and plaintiff replied, "it is, because it's still going on." (D.I. 61, ex. A, 27) Plaintiff testified that defendant was supposed to help him because the abuse was happening on "this tier." (D.I. 61, ex. A, 27)

He also told defendant about Casey before, and after, two basketball incidents he had with Casey. (*Id.*) The first incident occurred on May 16, 2004, during recreation at the HRYCI, when plaintiff was playing basketball with fifteen other inmates, including Casey, who did not like plaintiff's aggressive play and pushed or "mushed" him in the face. (D.I. 61, ex. A, 5, 11) The second incident occurred a few days later when ten inmates, including plaintiff and Casey, were playing basketball, and Casey again "mushed" or pushed him a second time because he did not like how plaintiff was playing and, according to plaintiff, because of the prior name calling. (*Id.* at 5-6) Plaintiff

---

[3] Plaintiff states that person he refers to is inmate Jimmy Lewis. (D.I. 94)

testified that Casey did not call him a child molester during the basketball game, but had called him that every day while they were on the tier. (*Id.*)

On May 31, 2004, plaintiff's jaw was broken by Casey while they were in the breakfast chow line. The incident occurred when Casey tried to butt in line in front of plaintiff, called plaintiff a child molester, and they began arguing. (*Id.* at 7-8) Plaintiff's back was turned and seconds later Casey hit him in the jaw; plaintiff fought back in defense. (*Id.*)

Plaintiff testified that Casey is "real hostile," and that he was moved off the tier because of his behavior but was later returned to the tier. (D.I. 61, ex. A, 6) Plaintiff believes that defendant had Casey removed from the pod for displaying inappropriate behavior. (D.I. 61, ex. A, 12) Defendant states, however, that Casey was in the transition unit, left the unit for a different program, and returned to the transition unit following that program. (D.I. 96, Muscarella aff.)

Defendant recalls speaking to classification personnel in an effort to help plaintiff, but the effort was in an advisory capacity. (D.I. 96, Muscarella aff.) Defendant states that she did not have the authority to reclassify prisoners to different prison facilities and did not have the authority to reclassify prisoners to specific housing. (*Id.*) At no time did defendant remove plaintiff from protective custody.[4] (D.I. 96, Muscarella aff.) Plaintiff testified that after he sustained the broken jaw, he spoke to defendant and told her that it would not have happened had she taken the proper steps since he "went to [her] tons of times about what [was] going on." (D.I. 61, ex. A, 5) Plaintiff never told defendant to

---

[4]The record contains a document indicating that plaintiff sought protective custody in 2001, a different time period than at issue in this case.

report to someone that Casey was calling him a child molester, but she told him that she was "basically going to take care of it." (D.I. 61, ex. A, 25) At no time did defendant believe that Casey was a substantial threat to plaintiff. (D.I. 96, Muscarella aff.) According to defendant, it was beyond her control and beyond her power to stop the fight between defendant and Casey. (*Id.*)

Following his injury, plaintiff was taken to the infirmary and examined. (D.I. 61, ex. A, 8) On June 1, 2004, plaintiff was referred to a "mid level provider", returned to his cell, and later that day was examined by a nurse. (D.I. 61, ex. C) At the time, he was still able to open his mouth and talk, but the next day he was unable to open his mouth for examination and unable to fully close his mouth due to pain. (*Id.*) Inmate housing records indicate that plaintiff was housed in the infirmary on June 2, 2004, and remained there until June 5, 2004. (D.I. 61, ex. E) He returned to his cell on June 5, 2004 and remained there until June 10, 2004, when he returned to the infirmary. (*Id.*) Plaintiff testified that while he was in his cell, after five or six days, he went to defendant for assistance with medical treatment and she was able to have plaintiff taken to the infirmary. (D.I. 61, ex. A, 8-9) He believes it was because of her intervention that he was taken to the infirmary.[5] (D.I. 61, ex. A, 25) On June 11, 2004, plaintiff underwent surgery at Christiana Care Health Services, spent the night there, returned to the HRYCI, and remained in the infirmary until July 6, 2004. (D.I. 61, ex. A, 21, exs. E, F; D.I. 76, ex. B)

---

[5]Plaintiff does not claim that defendant was deliberately indifferent to his medical needs.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Indeed, to survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported

allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Plaintiff moves for summary judgment on the grounds that there was adequate notice of an impending assault and defendant had a duty to protect him, a mentally ill inmate, from foreseeable risks of harm. (D.I. 86) Defendant moves for summary judgment on the grounds that plaintiff cannot show that defendant was aware of a substantial risk of harm, or that she disregarded such risk.[6] (D.I. 92)

### B. Failure to Protect

Plaintiff raises an Eighth Amendment failure to protect claim premised upon his claim that Casey called him a child molester, this placed him at risk, and Casey ultimately injured him. With respect to this claim, plaintiff has the burden to show that defendant knew of, and disregarded, an excessive risk to his health or safety. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also

---

[6] Defendant does not accept that plaintiff was assaulted and submits that an issue of fact remains as to whether plaintiff began the altercation or contributed to its escalation. Defendant should take note of the record as it reflects that an investigation by prison personnel revealed that Casey was the aggressor in the fight and, for his punishment, he was transferred to the disciplinary housing unit and placed in isolation for fifteen days. (D.I. 61, ex. H; D.I. 97, ex. G)

draw the inference." *Farmer*, 511 U.S. at 836. The deliberate indifference standard is not satisfied by either negligence or constructive notice. *Farmer*, 511 U.S. at 841.

The knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Id.; see also Hamilton v. Leavy*, 117 F.3d 742 (3d Cir. 1997). In order to survive defendant's summary judgment motion, plaintiff must produce sufficient evidence supporting the inference that defendant "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Beers-Capitol*, 256 F.3d at 132 (internal citation and quotation omitted); *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). Knowledge may be shown where the official has actual notice of the risk, *Nami v. Fauver*, 82 F.3d 63, 67-68 (3d Cir. 1996), or where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842. An inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996).

A risk is substantial when an inmate is threatened by another inmate with "known 'propensities' of violence toward" a particular class of people. *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005). "It is well known that "convicted child molesters may be in danger in a general prison population." *Brigden v. State ex rel. Oklahoma Dep't of Corr.* 129 F.3d 130, No. 96-3339, 1997 WL 687674, * 6 (10th Cir. Oct. 29, 1997) (table decision). "[I]n order to infer callous indifference when an official fails to protect a

prisoner form the risk of attack, there must be a 'strong likelihood' rather than a 'mere possibility' that violence will occur." *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006).

Plaintiff argues that it is well-documented that defendant was aware of his substantial risk of attack by Casey, but that defendant ignored his complaints. He contends that defendant failed to protect him when she failed to follow the procedure of the transition unit level system for inmate behavior. More particularly, he contends that Casey was removed from 1-D tier for displaying inappropriate behavior, but defendant returned Casey to 1-D whereupon he displayed the same behavior.

Defendant argues that the facts do not support a showing that she was aware of a substantial risk of harm to plaintiff and disregarded the risk; rather, she counseled plaintiff to avoid discord and tried to assist him in avoiding confrontations and, because plaintiff produced no information on what defendant could do to protect plaintiff from harm, she cannot be held liable for matters beyond her control.[7] (D.I. 92) Her affidavit is specific that at no time did she believe Casey was a substantial threat to plaintiff.

The question in the instant case is whether defendant was on notice that plaintiff allegedly faced a substantial risk of being assaulted by Casey and deliberately disregarded that risk. In support of plaintiff's position that defendant had the requisite knowledge, plaintiff testified that he told defendant on numerous occasions that Casey was calling him a child molester, that she reassured him it was not that serious, and that

---

[7]Defendant relies upon *Pinto v. Nettleship*, 737 F.2d 130 (1st Cir. 1984) for this last proposition. The issues in the case concern prison overcrowding and an insufficient number of guards.

she would take care of the problem. Additionally, plaintiff told defendant about two altercations with Casey that occurred just prior to the time Casey broke his jaw. Finally, defendant's progress notes indicate that approximately one month prior to the time of the assault by Casey, plaintiff specifically complained that he was struck in the face by an inmate (not Casey) because of his alleged sex offender status.

Plaintiff's failure to protect claim fails because he has not established deliberate indifference on the part of defendant. The record indicates that plaintiff advised defendant that Casey identified him, albeit incorrectly, as a child molester. While plaintiff made complaints of name calling, the record does not indicate that, at any time, he complained to defendant about a specific threat that Casey intended to injure him. Nor does the record indicate that plaintiff requested a transfer for protection from Casey.

Granted, plaintiff advised defendant of the two basketball pushing incidents that involved Casey. Progress notes indicate, however, that plaintiff had a history of horseplay and altercations with inmates.[8] There is also no indication in the record that plaintiff was particularly vulnerable but, rather, the progress notes indicate that plaintiff was able to protect himself. For example, when discussing horseplay, he stated the other individual "took the worst of it." Moreover, progress notes indicate that defendant counseled plaintiff about corrective action to enable him to avoid confrontation. Finally, at no time did defendant believe Casey was a substantial threat to plaintiff.

At most, defendant's failure to take any action constitutes negligence. Negligence, however, is insufficient to impose liability: "[A]n official's failure to alleviate a

---

[8]The progress notes do not identify any of those inmates.

significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838. Defendant did not believe that Casey was a substantial threat to plaintiff and nothing in the record suggests that defendant knew of, or condoned, the attack by Casey.

A reasonable factfinder could not conclude that defendant acted with deliberate indifference to plaintiff's safety. Therefore, the court will grant defendant's motion for summary judgment and will deny plaintiff's motion for summary judgment.

## IV. CONCLUSION

Based upon the above analysis, the court will grant defendant's motion for summary judgment and will deny plaintiff's motion for summary judgment. The court will deny as moot plaintiff's request for counsel. An appropriate order will issue.